**In re BLUE FLAME ENERGY CORPORATION, et al.**

[Cite as *In re Blue Flame Energy Corp.*, 171 Ohio App.3d 514, 2006-Ohio-6892.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 05AP–1053.

Decided Dec. 26, 2006.

516

518

522

Carlile, Patchen & Murphy, L.L.P., Dennis J. Concilla, and Douglas R. Jennings; Howard Z. Gopman & Assoc., Ltd., and Howard Z. Gopman, for appellees and cross-appellants, Blue Flame Energy Corporation et al.

Jim Petro, Attorney General, and Daniel P. Jones, Assistant Attorney General, for appellant and cross-appellee, Ohio Department of Commerce, Division of Securities.

Rex A. Staples, Stephen W. Hall, and Joseph Brady; Schottenstein, Zox & Dunn and Matthew L. Fornshell, for amicus curiae North American Securities Administrators Association, Inc.

---

KLATT, Presiding Judge.

{¶ 1} Appellant, the Ohio Department of Commerce, Division of Securities ("Division"), appeals from a judgment of the Franklin County Court of Common Pleas that reversed and vacated a cease-and-desist order that the Division issued

against appellees, Blue Flame Energy Corporation ("Blue Flame"), The Energy Group, Inc. ("Energy Group"), Pine Mountain 2002, Ltd. ("Pine"), Pike 2002, Ltd. ("Pike"), and Lawrence R. Buettner. For the following reasons, we affirm in part and reverse in part.

{¶ 2} Blue Flame, a Kentucky corporation, and Energy Group, an Illinois corporation, are engaged in the business of oil and natural gas exploration, development, and operations. Blue Flame is the managing general partner of Pine and Pike, both Kentucky limited partnerships. Blue Flame formed Pine and Pike to finance natural-gas drilling and operations in Eastern Kentucky's Appalachian Basin. Buettner, a security salesman licensed by Ohio, is the president of Blue Flame and Energy Group, as well as a promoter of Pine and Pike.

{¶ 3} In 2002, Blue Flame, on behalf of Pine and Pike, filed with the Division a Form D[1] for each limited partnership. Each Form D notified the Division that the respective limited partnership was offering partnership interests for sale and claiming an exemption from federal security-registration requirements pursuant to Rule 506[2] of Regulation D. According to the forms, one Ohio investor had already purchased a partnership interest in Pine, and another Ohio investor had purchased an interest in Pike.

{¶ 4} On January 24, 2003, the Division issued to appellees a Notice of Opportunity for Hearing in which the Division alleged that appellees had violated R.C. 1707.44(C)(1) by offering to sell nonexempt, nonregistered securities. R.C. 1707.44(C)(1) provides that "[n]o person shall knowingly sell, cause to be sold, offer for sale, or cause to be offered for sale, any security which * * * [i]s not * * * the subject matter of one of the transactions exempted in section 1707.03." One type of transaction exempted in R.C. 1707.03 is "[a]ny offer or sale of securities made in reliance on the exemption provided in Rule 506 of Regulation D under the Securities Act of 1933, and in accordance with Rules 501 to 503 of Regulation D." R.C. 1707.03(X).

{¶ 5} In the Notice of Opportunity, the Division recognized that Blue Flame had filed with the Division a Form D for Pine and another for Pike, both of which manifested appellees' reliance upon the Rule 506 and R.C. 1707.03(X) exemptions.

---

1. Formally entitled "Form D—Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption," a Form D is a form created by the Securities and Exchange Commission ("SEC") that requests certain basic information about the issuer and offering. See Section 239.500, Title 17, C.F.R. Issuers initially file the Form D with the SEC. See Section 230.503, Title 17, C.F.R. Ohio law mandates that issuers also file the Form D with the Division. R.C. 1707.03(X)(1).

2. Rule 506 sets forth an exemption for "transactions not involving any public offering * * * *." Section 230.506, Title 17, C.F.R.

However, the Division alleged that appellees could not rely upon those exemptions because appellees failed to satisfy the Regulation D conditions, namely, the condition that appellees refrain from engaging in general solicitation and general advertising. See Section 230.502(c), Title 17, C.F.R. The Division maintained that appellees had generally solicited and advertised for investors on a website that Blue Flame maintained, a second website that Energy Group maintained, and in an article that "The Bull and Bear Financial Report" posted on its website.

{¶ 6} Appellees requested a hearing and stipulated to facts submitted to the hearing examiner. After reviewing the joint stipulations and the parties' briefs, the hearing examiner issued a report and recommendation finding that appellees had violated R.C. 1707.44(C)(1) and recommending that the Commissioner of Securities ("Commissioner") issue a cease-and-desist order. On January 26, 2004, the Commissioner followed the hearing examiner's recommendation and issued the order.

{¶ 7} Appellees filed a timely administrative appeal to the trial court pursuant to R.C. 119.12. The trial court referred the matter to a magistrate, who recommended that the trial court reverse and vacate the Commissioner's order. The magistrate based this recommendation on three separate and independent reasons. First, the magistrate held that federal law expressly preempted the Division from regulating the issuance and sale of appellees' securities because appellees relied upon the Rule 506 exemption in offering them for sale. Second, the magistrate concluded that the Division lacked personal jurisdiction over appellees. Third, the magistrate found that Ohio Adm.Code 1301:6–3–03(E)(8), which sets forth another exemption to Ohio's registration requirements, applied and provided a successful defense to appellees' violation of R.C. 1707.44(C)(1).

{¶ 8} The magistrate did make one finding in the Division's favor—that reliable, probative, and substantial evidence supported the hearing examiner's conclusion that the offer and sale of appellees' securities failed to qualify for the Rule 506 and R.C. 1707.03(X) exemptions. However, because federal law preempted the application of R.C. 1707.44(C)(1) to appellees' securities, this finding was irrelevant to the magistrate's ultimate recommendation.

{¶ 9} The trial court considered both parties' objections to the magistrate's report and recommendation, rejected all the objections, and adopted the magistrate's decision. On September 9, 2005, the trial court issued a judgment entry in which it reversed and vacated the cease-and-desist order. The Division now appeals from that judgment.

{¶ 10} On appeal, the Division assigns the following errors:

[1.] The lower court erred in failing to apply the appropriate standard of review to the factual findings made by the administrative hearing officer and affirmed by the Commissioner of Securities.

[2.] The lower court erred in ruling that the Ohio Division of Securities was preempted by federal law from enforcing Ohio's blue sky laws against offerors of securities who claimed an invalid exemption from Ohio's registration requirements while in fact making a general solicitation offer by the internet.

[3.] The lower court erred in failing to consider all facts when ruling that the Ohio Division of Securities lacked jurisdiction to protect Ohio investors who were solicited to buy securities by Blue Flame, et al.

[4.] The lower court erred in misinterpreting the Ohio Division of Securities administrative rule on internet offerings.

[5.] The lower court erred in assigning a criminal burden of proof to the Ohio Division of Securities in a civil administrative proceeding.

[6.] The lower court erred in rejecting the Ohio Division of Securities' objections to the Magistrate Judge's Recommendations on the basis that the objections were "immaterial" in light of the federal preemption defense.

{¶ 11} Also, appellees assign the following conditional cross-assignment of error:

The lower court erred in failing to reverse the administrative hearing officer's finding that the websites violated SEC Regulation D.

{¶ 12} Because the Division's third assignment of error relates to jurisdiction, we will address it first. By this assignment of error, the Division maintains that the trial court erred in holding that the Division lacked personal jurisdiction over appellees. While we agree that the trial court erred with regard to Blue Flame, Pine, Pike, and Buettner, we conclude that the trial court was correct in finding that it did not have personal jurisdiction over Energy Group.

{¶ 13} Whether a forum can claim jurisdiction over an individual is a question of law, which this court reviews under the de novo standard. *Joffe v. Cable Tech, Inc.*, 163 Ohio App.3d 479, 2005-Ohio-4930, 839 N.E.2d 67, at ¶ 10. See, also, *AmCare, Inc. v. Ohio Dept. of Job & Family Servs.*, 161 Ohio App.3d 350, 2005-Ohio-2714, 830 N.E.2d 406, at ¶ 10 (appellate review of an administrative decision presenting a question of law is de novo). The party who asserts the existence of personal jurisdiction has the burden of establishing that jurisdiction once the opposing party challenges it. *Klug v. Trivison* (2000), 137 Ohio App.3d 838, 842, 739 N.E.2d 1243.

{¶ 14} None of appellees reside in Ohio. In deciding whether Ohio has jurisdiction over nonresident defendants, a court must engage in a two-step

analysis. *U.S. Sprint Communications Co. Ltd. Partnership v. Mr. K's Foods, Inc.* (1994), 68 Ohio St.3d 181, 183, 624 N.E.2d 1048; *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.* (1990), 53 Ohio St.3d 73, 75, 559 N.E.2d 477. The court must first determine whether Ohio's long-arm statute, R.C. 2307.382, and the applicable Rule of Civil Procedure, Civ.R. 4.3(A), confer jurisdiction. *U.S. Sprint Communications* at 184, 624 N.E.2d 1048; *Kentucky Oaks Mall Co.* at 75, 559 N.E.2d 477. Second, the court must determine whether granting jurisdiction would deprive the nonresident of due process of law under the Fourteenth Amendment to the United States Constitution. Id.

■ {¶ 15} In the case at bar, we need not engage in the first step of the analysis because neither the long-arm statute nor the Rules of Civil Procedure apply to regulatory actions. The long-arm statute designates when "[a] *court* may exercise personal jurisdiction over a person * * * as to a *cause of action.*" (Emphasis added.) R.C. 2307.382(A). As this matter neither originated in a court nor through a cause of action, the long-arm statute, by its very terms, is inapplicable. The Rules of Civil Procedure also apply to courts, not adjudicatory proceedings before administrative agencies. *Kathmandu, Inc. v. Bowland* (Sept. 28, 1999), Franklin App. No. 99AP–36, 2000 WL 192554 ("The proceeding before the commission was administrative in nature and, therefore, the civil rules are not applicable"); *Vaughn v. State Med. Bd.* (Aug. 6, 1991), Franklin App. No. 90AP–1160, 1991 WL 150950 ("[T]he Civil Rules are not binding in adjudicatory proceedings before administrative agencies"). Accordingly, we must focus upon whether the Division's exercise of jurisdiction over appellees infringed upon their right to due process.

■ {¶ 16} The Due Process Clause protects an individual from being subject to the binding judgments of a forum in which he has not established any meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz* (1985), 471 U.S. 462, 471–472, 105 S.Ct. 2174, 85 L.Ed.2d 528, quoting *Internatl. Shoe Co. v. Washington* (1945), 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95. Due process is satisfied if a forum has either specific or general jurisdiction over a nonresident defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall* (1984), 466 U.S. 408, 414–415, 104 S.Ct. 1868, 80 L.Ed.2d 404, fns. 8 and 9. Specific jurisdiction turns upon the relationship between the defendant, forum, and litigation, and exists only when the litigation at hand arises out of or relates to a defendant's "minimum contacts" with the forum. *Burger King* at 472, 105 S.Ct. 2174, 85 L.Ed.2d 528. General jurisdiction, on the other hand, is based upon "continuous and systematic" contacts with the forum that are unrelated to the underlying litigation. *Helicopteros* at 415, 104 S.Ct. 1868, 80 L.Ed.2d 404, fn. 9.

■ {¶ 17} Regardless of these classifications, jurisdiction is proper only when a party " 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Burger King* at 475, 105 S.Ct. 2174, 85 L.Ed.2d 528, quoting *Hanson v. Denckla* (1958), 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283. The "purposeful availment" requirement—the constitutional touchstone of personal jurisdiction—ensures that a party will only be haled into a jurisdiction where it has either deliberately engaged in significant activities or created continuing obligations between itself and residents of the state. *Burger King,* 471 U.S. at 475–476, 105 S.Ct. 2174, 85 L.Ed.2d 528.

■ {¶ 18} In the case at bar, we will first consider whether the Division had specific jurisdiction over appellees. Three criteria must be met in order to establish specific jurisdiction over a defendant: (1) the defendant must purposefully avail itself of the privilege of acting in the forum state or causing a consequence in the forum state, (2) the litigation must arise from the defendant's activities in the forum state, and (3) the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Ricker v. Fraza/Forklifts of Detroit,* 160 Ohio App.3d 634, 2005-Ohio-1945, 828 N.E.2d 205, at ¶ 16; *KB Circuits, Inc. v. BECS Technology, Inc.* (Jan. 18, 2001), Franklin App. No. 00AP–621, 2001 WL 40584.

■ {¶ 19} With regard to Energy Group, the Division argues that the maintenance of the Energy Group website is sufficient activity to amount to purposeful availment. We disagree.

■ {¶ 20} "A defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.* (C.A.6, 2002), 282 F.3d 883, 890. See, also, *Bird v. Parsons* (C.A.6, 2002), 289 F.3d 865, 874. A passive website, i.e., one that does little more than display information, does not subject a defendant to specific jurisdiction. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa.1997), 952 F.Supp. 1119, 1124. See, also, *Neogen,* at 890 ("The level of contact with a state that occurs simply from the fact of a website's availability on the Internet is therefore an 'attenuated' contact that falls short of purposeful availment"). On the opposite end of the spectrum, an interactive website, i.e., one through which the defendant engages in knowing and repeated contacts with the user, demonstrates purposeful availment. *Zippo Mfg. Co.,* at 1124. When the interactivity of a website falls between the two extremes, the exercise of jurisdiction is dependent upon the level of interactivity and the commercial nature of the exchange of information that occurs on the website. Id.

{¶ 21} Here, the bulk of Energy Group's website was devoted to explaining oil and gas development and operations and to advertising Energy Group and its activities in the oil and gas field. Such communications constitute passively posted information and cannot serve as a basis for jurisdiction. *Neogen,* 282 F.3d at 890 (advertisements for services and basic contact information constitutes passively posted information); *Jennings v. AC Hydraulic A/S* (C.A.7, 2004), 383 F.3d 546, 549 (a website is passive if it merely makes available information about the company and its products); *Mink v. AAAA Dev., L.L.C.* (C.A.5, 1999), 190 F.3d 333, 336–337 (posting information about a company's products and services and providing the means to contact the company "does not classify the website as anything more than passive advertisement which is not grounds for the exercise of personal jurisdiction").

{¶ 22} In so holding, we do not construe Energy Group's website postings as sales to Ohio residents. The Division urges us to apply the statutory definition of "sale" contained in R.C. 1707.01(C), which defines "sale" to include mere advertising, to the jurisdictional analysis. Although this definition has relevance to the determination of the merits of this case, it has no applicability outside of that context. R.C. 1701.01 (limiting definitions therein to terms "[a]s used in [Chapter 1707, et seq.]"). If we were to accept the Division's argument that advertising a security through a website constitutes a "sale" in Ohio, then the Division would have jurisdiction over every issuer who maintains a promotional website, regardless of whether the issuer actually sells or intends to sell securities in Ohio. Personal jurisdiction exists only in forums in which a party has purposeful, deliberate contact, not random contact occasioned by the wide accessibility of the internet.

{¶ 23} Other than advertising, Energy Group's website also contained an on-line form that Energy Group encouraged visitors to fill out "[t]o see if you qualify as an Accredited Investor for The Energy Group, Inc.'s future drilling and development programs." The form included dialogue boxes for a visitor to enter his name, address, phone numbers, and email address, and to share remarks. For purposes of the specific jurisdiction analysis, providing such an on-line form does not necessarily render an otherwise passive website interactive. *See, Inc. v. Imago Eyewear Pty, Ltd.* (C.A.6, 2006), 167 Fed.Appx. 518, 523, citing *McGill Technology Ltd. v. Gourmet Technologies, Inc.* (E.D.Mich.2004), 300 F.Supp.2d 501, 507. Further, even if the form made Energy Group's website "semi-interactive," there is no evidence that any exchange of information between Energy Group and Ohio residents occurred as a result of the form. Thus, the website does not constitute purposeful availment. *Cadle Co. v. Schlichtmann* (C.A.6, 2005), 123 Fed.Appx. 675, 678 ("Because [the plaintiff] has not alleged that any interaction or exchange of information occurred between [the defendant] and

Ohio residents via the website, personal jurisdiction over [the defendant] does not exist based on the nature of the website"). Without any basis to find purposeful availment, we conclude that the trial court properly found that the Division lacked personal jurisdiction over Energy Group.[3]

{¶ 24} Next, we turn to Blue Flame, Pine, and Pike and consider whether those entities conducted sufficient activity in Ohio to justify the Division's exercise of personal jurisdiction over them. Like Energy Group, Blue Flame also maintained a website, the majority of which advertised the company and the investment opportunities it offered. Unlike the Energy Group website, the Blue Flame website did not contain any interactive form; rather, it merely listed the addresses and telephone numbers of its offices. As we recognized above, a website is passive if it simply posts basic contact information and advertises the company's products or services. *Neogen*, 282 F.3d at 890; *Mink*, 190 F.3d at 336–337. Accordingly, Blue Flame's website is an insufficient basis on which to claim personal jurisdiction.

{¶ 25} The Division, however, also argues three other bases for claiming jurisdiction over Blue Flame, Pine, and Pike. First, the Division relies upon the article contained on "The Bull and Bear Financial Report" website, which touted Blue Flame and its investment opportunities and included Blue Flame's telephone numbers, address, website address, and email address. However, the website is similar to the others in that it is passive and thus, does not constitute personal availment. See *Neogen*, 282 F.3d at 890; *Mink*, 190 F.3d at 337.

{¶ 26} Second, the Division points to the sales of partnership interests in Pine and Pike to two Ohio residents. We agree that by making these sales, Blue Flame, Pine, and Pike purposefully availed themselves of the privileges of acting in Ohio. Therefore, we must consider the second criterion of the specific jurisdiction analysis—whether the Division's regulatory action arose from the sale of the two partnership interests. The second criterion does not require that the regulatory action formally "arise from" a defendant's contacts with the forum, but instead, requires only that a defendant's contacts with the forum state are "related to" the operative facts of the controversy. *CompuServe, Inc. v. Patterson* (C.A.6, 1996), 89 F.3d 1257, 1267; *Third Natl. Bank v. WEDGE Group, Inc.* (C.A.6, 1989), 882 F.2d 1087, 1091. Yet, even under this less strenuous requirement, the Division fails. The regulatory action stemmed from the websites' content, which according to the Division, precluded appellees from claiming

---

3. We need not conduct a separate general jurisdiction analysis before reaching this conclusion because the Division relies solely upon the website to establish personal jurisdiction over Energy Group. As the website does not constitute purposeful availment, it cannot form the basis for either specific or general jurisdiction.

private placement exemptions under Rule 506 and R.C. 1707.03(X). However, nothing in the stipulated evidence indicates that the two purchasers viewed the websites, much less that they were influenced by the advertising on the websites, or that Blue Flame completed the sales after the purchasers contacted them through the websites. Consequently, we conclude that the regulatory action and two sales are not related, and thus, the sales cannot serve as a basis for personal jurisdiction over Blue Flame, Pine, or Pike.

{¶ 27} Third, the Division argues that the act of filing the Form Ds with the Division is a sufficient contact with Ohio to establish personal jurisdiction. In filing the Form Ds, Blue Flame, Pine, and Pike purposefully availed themselves of the privilege of acting in Ohio, thus meeting the first criterion. Further, we conclude that the filing of the Form Ds related to the facts underlying this regulatory action. In the Notice of Opportunity, the Division recognized that Blue Flame, Pine, and Pike were claiming a Rule 506 exemption. Integral to claiming this exemption is the filing of a Form D before the SEC and, for notice purposes, the Division. See Section 230.503, Title 17, C.F.R.; R.C. 1707.03(X)(1). Thus, the filing of the Form Ds informed the Division of the grounds on which Blue Flame, Pine, and Pike sought to avoid the very regulatory action the Division pursued against them. Given this connection, the Division satisfied the second criterion.

{¶ 28} The third specific jurisdiction criterion requires that the exercise of jurisdiction must be reasonable, i.e., that it comport with traditional notions of " 'fair play and substantial justice.' " *Burger King,* 471 U.S. at 476, 105 S.Ct. 2174, 85 L.Ed.2d 528, quoting *Internatl. Shoe,* 326 U.S. at 320, 66 S.Ct. 154, 90 L.Ed. 95. In determining the reasonability of jurisdiction, courts may evaluate the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, the interest of other states in obtaining the most efficient resolution of controversies, and the forum state's interest in furthering fundamental substantive social policies. *Burger King* at 477, 105 S.Ct. 2174, 85 L.Ed.2d 528, quoting *World–Wide Volkswagen Corp. v. Woodson* (1980), 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490. Notably, when the first two specific jurisdiction criteria are met, an inference arises that the third criterion is also present. *CompuServe,* 89 F.3d at 1268; *Creech v. Roberts* (C.A.6, 1990), 908 F.2d 75, 80 (if a court finds that the first two criteria are satisfied, then "only the unusual case will not satisfy the third factor").

{¶ 29} Blue Flame, Pine, and Pike present no argument regarding this last criterion, while the Division aggressively asserts its interest in protecting Ohio investors. After weighing the considerations, we conclude that this is not the unusual case that fails to meet the third criterion after satisfying the first two.

Accordingly, we hold that based upon the filing of the two Form Ds, the Division obtained personal jurisdiction over Blue Flame, Pine, and Pike.

 {¶ 30} Finally, we must consider whether Buettner purposefully availed himself of Ohio. The evidence demonstrates that in his individual capacity, Buettner has only one connection to Ohio—he is a securities salesman licensed by the Division. Although this connection qualifies as purposeful availment, the Division fails to show how Buettner's license relates to the operative facts of the regulatory action. Therefore, if the Division were to rely upon Buettner's license alone, it could not claim personal jurisdiction over him. However, the Division also points to Buettner's actions in his official capacity as the president of Blue Flame—specifically, his signature on the Form Ds—to justify its assertion of personal jurisdiction. In response, Buettner argues that actions undertaken in his official capacity cannot support the exercise of jurisdiction over him personally. We find the Division's argument more persuasive.

 {¶ 31} Jurisdiction over individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation. *Intera Corp. v. Henderson* (C.A.6, 2005), 428 F.3d 605, 616; *Balance Dynamics Corp. v. Schmitt Industries, Inc.* (C.A.6, 2000), 204 F.3d 683, 698. However, the fact that the actions connecting the officers to the state were undertaken in an official, rather than personal, capacity does not preclude the exercise of personal jurisdiction over those defendants. Id. Thus,

> where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposefully availed herself of the forum and the reasonably foreseeable consequences of that availment.

Id. Applying the above rule of law, we conclude that when Buettner signed the Form Ds and filed them in Ohio, he purposefully availed himself of this state. Therefore, we hold that the Division properly claimed personal jurisdiction over Buettner.

{¶ 32} In summary, we hold that the Division had personal jurisdiction over Blue Flame, Pine, Pike, and Buettner, but not over Energy Group.[4] Thus, we sustain, in part, and overrule, in part, the Division's third assignment of error.

 {¶ 33} Next, we turn to the Division's second assignment of error, by which the Division argues that the trial court erred in holding that federal law preempted the enforcement of Ohio's blue sky laws against appellees. We agree.

---

4. Hereinafter, any reference to "appellees" excludes Energy Group.

{¶ 34} In its decision, the trial court accepted appellees' argument that the National Securities Market Improvement Act of 1996 ("NSMIA") preempts the Division's regulation of appellees' offerings. Appellees assert that NSMIA, specifically Section 77r, Title 15, U.S.Code, prohibits any state legislation regulating "covered securities," a category that, appellees argue, contains all securities offered and sold in reliance upon Rule 506. Because appellees invoked the Rule 506 exemption for their offerings, they maintain that only the SEC has authority to regulate the offerings.

{¶ 35} The Division, on the other hand, asserts that appellees' argument extends the scope of federal preemption beyond the plain language of Section 77r. That provision, they contend, only prohibits state law from regulating securities that *actually are* "covered securities." The Division asserts that appellees' offerings are not valid "covered securities" because they failed to satisfy all the conditions necessary to qualify for the Rule 506 exemption. Without the Rule 506 exemption, and the concomitant R.C. 1707.03(X) exemption, appellees' securities are public offerings that fall within Ohio's regulatory purview.

{¶ 36} Our consideration of the parties' arguments must start with a review of Congress's power to preempt state law. Pursuant to the Supremacy Clause of the United States Constitution, "the Laws of the United States * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Clause 2, Article VI, United States Constitution. The ultimate touchstone of any preemption analysis is congressional intent. *Lorillard Tobacco Co. v. Reilly* (2001), 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532; *Medtronic, Inc. v. Lohr* (1996), 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700; *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407. Congressional intent may either be explicitly stated in a statute's language or implicitly contained in the structure and purpose. *Medtronic,* at 486, 116 S.Ct. 2240, 135 L.Ed.2d 700; *Cipollone,* at 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 Specifically, federal preemption of state law can occur by express language in a congressional enactment (express preemption), by implication from the depth and breadth of a congressional scheme that occupies the entire legislative field (field preemption), and by implication because of an actual conflict between federal and state law (conflict preemption). *Lorillard Tobacco,* 533 U.S. at 541, 121 S.Ct. 2404, 150 L.Ed.2d 532; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995), 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695.

{¶ 37} When Congress has included an express preemption provision in the statutory scheme, the " 'task of statutory construction must in the first instance focus on the plain wording of the [provision], which necessarily contains the best evidence of Congress' pre-emptive intent.' " *Sprietsma v. Mercury*

*Marine* (2002), 537 U.S. 51, 62–63, 123 S.Ct. 518, 154 L.Ed.2d 466, quoting *CSX Transp., Inc. v. Easterwood* (1993), 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387. See, also, *Lorillard Tobacco,* 533 U.S. at 542, 121 S.Ct. 2404, 150 L.Ed.2d 532 (a court's preemption "analysis begins with the language of the statute"). If the express preemption provision unambiguously precludes certain types of state legislation, a court need not go any further than the statutory language to determine whether the state law is preempted. *Exxon Corp. v. Hunt* (1986), 475 U.S. 355, 362, 106 S.Ct. 1103, 89 L.Ed.2d 364. Alternatively, if the express preemption provision is ambiguous, a court has a duty to accept the reading that disfavors preemption, particularly in areas of traditional state regulation. *Bates v. Dow Agrosciences, L.L.C.* (2005), 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687. See, also, *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt [state law]"); *New York State Conference of Blue Cross & Blue Shield Plans,* 514 U.S. at 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 ("[D]espite the variety of * * * opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law").

{¶ 38} In the case at bar, the relevant express preemption provision is Section 77r, which reads:

Except as otherwise provided in this section, no law, rule, regulation, or order, or other administrative action of any State or any political subdivision thereof—

(1) requiring, or with respect to, registration or qualification of securities, or registration or qualification of securities transactions, shall directly or indirectly apply to a security that—

(A) is a covered security; or

(B) will be a covered security upon completion of the transaction;

(2) shall directly or indirectly prohibit, limit, or impose any conditions upon the use of—

(A) with respect to a covered security described in subsection (b) of this section, any offering document that is prepared by or on behalf of the issuer; or

* * *

(3) shall directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any security described in paragraph (1).

Section 77r(a), Title 15, U.S.Code.

{¶ 39} Thus, according to Section 77r(a), state law is preempted to the extent that it attempts to regulate the issuance and sale of a "covered security." Section

77r(b) defines what constitutes a "covered security," specifying, in part, that a security is a "covered security" if it *"is exempt* from registration under this subchapter pursuant to" certain enumerated provisions. (Emphasis added.) Section 77r(b)(4), Title 15, U.S.Code. The import of this unambiguous language is that in order to be a "covered security" under Section 77r(b)(4), a security must be exempt. Therefore, Section 77r precludes state law from regulating certain securities that are exempt from federal regulation, making preemption and exemption coterminous. *Hamby v. Clearwater Consulting Concepts, L.L.L.P.* (E.D.Ark.2006), 428 F.Supp.2d 915, 921 ("[T]he only way to assert federal preemption is to first show that an exemption from federal registration actually applies"); *Buist v. Time Domain Corp.* (Ala.2005), 926 So.2d 290, 296 (holding that preemption and exemption are "functionally equivalent").

{¶ 40} Appellees claim that their offerings constitute "covered securities" pursuant to Section 77r(b)(4)(D), which extends the definition of "covered securities" to include securities offered and sold in transactions exempt under "Commission rules or regulations issued under section 77d(2) of this title." Section 77d(2) provides an exemption from federal registration requirements to "transactions by a issuer not involving any public offering." Under the authority of that section, the SEC promulgated Rule 506 in order to supply investors with a safe harbor from registration requirements. *McGonigle v. Combs* (C.A.9, 1992), 968 F.2d 810, 825, fn. 19; *Secs. & Exchange Comm. v. Life Partners, Inc.* (D.D.C. 1996), 912 F.Supp. 4, 10. Pursuant to Rule 506, offers and sales of an issuer's securities "shall be deemed to be transactions not involving any public offering" only if they satisfy certain conditions, which include meeting "all the terms and conditions of §§ 230.501 and 230.502." Section 230.506(a) and (b), Title 17, C.F.R. Accordingly, appellees' offerings qualify as "covered securities," and Ohio law is preempted, if appellees offered and sold their securities in transactions that satisfy the Rule 506 conditions.

{¶ 41} Appellees, however, argue that their offerings do not need to actually comply with the Rule 506 conditions in order for their securities to constitute "covered securities." Relying upon *Temple v. Gorman* (S.D.Fla.2002), 201 F.Supp.2d 1238, and its progeny,[5] appellees contend that as long as they offer and sell their securities *in reliance upon* Rule 506, their offerings are "covered securities," and preemption applies.

{¶ 42} In *Temple,* the defendants offered, solicited, and sold shares in a private offering of securities that purported to be exempt from registration pursuant to

---

5. *Temple's* progeny consists of *Pinnacle Communications Internatl., Inc. v. Am. Family Mtge. Corp.* (D.Minn.2006), 417 F.Supp.2d 1073, and *Lillard v. Stockton* (N.D.Okla.2003), 267 F.Supp.2d 1081. Neither case offers any additional analysis of the preemption issue.

Rule 506. The plaintiffs, who purchased shares, filed a complaint seeking rescission of their stock purchases and reimbursement for the amounts paid for the securities. Alleging that the stock offering failed to comply with the requirements of Rule 506, the plaintiffs claimed that the defendants' sales of unregistered securities violated Florida law, and they sought a declaratory judgment to that effect. In response, the defendants moved to dismiss the plaintiffs' claims, arguing that NSMIA preempted the application of Florida law to their private offering. The trial court reviewed the legislative history of NSMIA and found that Congress intended to preempt state laws whenever securities are " 'offered or sold *pursuant to* a Commission rule or regulation adopted under Section 4(2).' " (Emphasis added.) Id., at 1243, quoting H.R.Rep. No. 104–622 (1996) 32, reprinted in 1996 U.S.C.C.A.N. 3877, 3894–3895. Thus, the court held that, "[r]egardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal 'covered securities' because they were sold pursuant to those rules." Id. at 1244.

{¶ 43} We find *Temple* and its progeny unpersuasive. In order to reach its holding, the *Temple* court supplanted the plain language of Section 77r with its own reading of the statute. As we stated above, a security is covered if it "*is exempt* from registration," not if it is sold *pursuant to* a putative exemption. (Emphasis added.) Section 77r(b)(4), Title 15, U.S.Code. Although the *Temple* court relied upon legislative intent in crafting its alternative reading of Section 77r, intent is irrelevant if the statute is unambiguous. *Hughes Aircraft Co. v. Jacobson* (1999), 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 ("As in any case of statutory construction, our analysis begins with 'the language of the statute.' * * * And where the statutory language provides a clear answer, it ends there as well"). Appellees do not point to, and we cannot find, any ambiguity in Section 77r.

{¶ 44} Further, we decline to follow *Temple* because, as other authorities have recognized, the *Temple* court's reading of Section 77r would allow an issuer to avoid any state regulation or liability under state law simply by claiming compliance with Regulation D. *Grubka v. WebAccess Internatl., Inc.* (D.Colo. 2006), 445 F.Supp.2d 1259, 1270; 12 Long, Blue Sky Law (2006), Section 3:81, fn. 7 ("If all that was required for preemption was a bald-face statement that the offering was made under Rule 506, then any con artist could avoid state registration by telling the investor that the offering was a private placement under Rule 506"); Cohn, Securities Counseling for Small and Emerging Companies (2006), Section 6:24.50 ("Unless courts require at a minimum a bona fide effort to comply with [R]ule 506, the mere assertion of form would control, and

sham Rule 506 offerings would be exempt from state registration or exemption laws").

{¶ 45} Based upon the foregoing, we conclude that Section 77r expressly preempts state laws from regulating the issuance and sale of those securities that actually are exempt under Rule 506. Consequently, we must now address whether appellees' offerings qualify for the Rule 506 exemption. If they do, then federal law preempts the application of state law to regulate appellees' securities.

{¶ 46} Tangentially, we reject the Division's argument that the law-of-the-case doctrine requires us to find that appellees failed to qualify for the Rule 506 exemption. As we stated above, exemption under Rule 506 is dependent upon the issuer satisfying certain conditions, including the condition contained in Section 230.502(c), Title 17, C.F.R. ("Rule 502"). Pursuant to Rule 502, an issuer cannot use general solicitation or general advertising in connection with private offerings. Here, the Commissioner concluded that appellees engaged in general solicitation and general advertising, thus vitiating their claimed exemption under Rule 506. The trial court upheld this conclusion on appeal, even though it ultimately entered judgment in appellees' favor on other grounds. Appellees did not file a notice of cross-appeal, but they included in their brief a cross-assignment of error challenging the trial court's holding on the Rule 506 exemption issue. The Division now asserts that the appellees' failure to file a notice of cross-appeal results in that holding becoming law of the case.

{¶ 47} App.R. 3(C)(2) states that "[a] person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial court but who does not seek to change the judgment or order is not required to file a notice of cross appeal." Here, appellees do not seek to change the trial court's judgment, which reversed and vacated the Commissioner's cease-and-desist order. Rather, they merely seek to defend the judgment on a ground different from that the trial court relied upon, i.e., that their securities transactions are exempt under Rule 506. Therefore, appellees did not have to file a notice of cross-appeal to challenge the trial court's holding, and the trial court's resolution of the Rule 506 exemption issue is not law of the case. See *Gessner v. Union,* 159 Ohio App.3d 43, 2004-Ohio-5770, 823 N.E.2d 1, at ¶ 24–26; *Krause v. Spartan Stores, Inc.,* 158 Ohio App.3d 304, 2004-Ohio-4365, 815 N.E.2d 696, at ¶ 9–11; *Hahn v. Satullo,* 156 Ohio App.3d 412, 2004-Ohio-1057, 806 N.E.2d 567, at ¶ 28. See, also, Staff Notes, App.R.3 (1992) ("If the appellee seeks only to support the judgment or order, it can do so * * * on grounds rejected * * * by the trial court without filing a notice of appeal").

{¶ 48} As we are not bound by the law-of-the-case doctrine, we now consider the merits of the Rule 506 exemption issue. The trial court found that

reliable, probative, and substantial evidence supported the Commissioner's finding that the offer and sale of appellees' securities via the Blue Flame website violated the ban on general advertising and general solicitation contained in Rule 502. Pursuant to R.C. 119.12, when a common pleas court reviews an order of an administrative agency, the court must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law. To be "reliable," evidence must be dependable and true within a reasonable probability. *Our Place, Inc. v. Ohio Liquor Control Comm.* (1992), 63 Ohio St.3d 570, 571, 589 N.E.2d 1303. To be "probative," evidence must be relevant or, in other words, tend to prove the issue in question. Id. To be "substantial," evidence must have importance and value. Id.

{¶ 49} Unlike a trial court, an appellate court may not review the evidence. *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. An appellate court is limited to determining whether the trial court abused its discretion, i.e., whether the trial court demonstrated a perversity of will, passion, prejudice, partiality, or moral delinquency. Id. Absent such an abuse of discretion, an appellate court must affirm the trial court's judgment, even if the appellate court would have arrived at a different conclusion than the trial court. *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.* (1988), 40 Ohio St.3d 257, 261, 533 N.E.2d 264.

{¶ 50} Rule 502 states:

[N]either the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to, the following:

(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio * * *.

Section 230.502(c), Title 17, C.F.R. Thus, Rule 502 involves two inquiries: (1) is the communication in question a general solicitation or general advertisement? and (2) is the issuer or someone on the issuer's behalf using the communication to offer or sell the securities? Interpretive Release on Regulation D, Securities Act of 1933, Release No. 33–6455 (Mar. 3, 1983). If either inquiry renders a negative answer, then the issuer has satisfied the Rule 502 condition. Id.

{¶ 51} The emphasis of the first inquiry is on the scope of the communication, specifically, whether it is generally or only limitedly available. Posting information about a private offering on an issuer's unrestricted, and therefore publicly available, website is not consistent with the restriction on general solicitation and advertising. Use of Electronic Media, Securities Act of 1933,

Release No. 33–7856 (Apr. 28, 2000). On the other hand, a password-protected website that permits access to information about private offerings only to an accredited or sophisticated investor is consistent with the restriction. IPONET, SEC No–Action Letter (July 26, 1996). Here, the parties do not dispute that Blue Flame's website was publicly available. Therefore, we conclude that appellees' communications on that website constitute general solicitations or general advertisements.

{¶ 52} The second inquiry focuses upon the content of the issuer's communication. If the content indicates that the communication is designed to procure orders for a security, arouse interest in a security, or condition the public mind, then the communication is an offer to sell securities. Offering of Interests in Thoroughbred Racing Stable, SEC No–Action Letter (Jan. 6, 1976). See, also, Gerald F. Gerstenfeld, SEC No–Action Letter (Dec. 3, 1985) (if "the primary purpose of the advertisement is to sell securities and to condition the market for future sales, the advertisement would constitute an offer"). Further, even if a communication does not directly refer to the securities the issuer is currently offering for sale, it constitutes an offer if it is used to solicit investors to the program as a whole. Alma Securities Corp., SEC No–Action Letter (Aug. 2, 1982).

{¶ 53} Here, the Blue Flame website touted the merits of the type of security appellees offered, claiming that their direct participation programs had "[s]ignificant tax advantages," that "[t]urnkey '[f]lat-[f]ee' investment pricing prevents cost overruns," that investors would have "[d]irect ownership of real assets," and that "[t]ime tested, private placement partnership format limits liability and maximizes tax sheltered income." After reviewing the totality of the website, the hearing examiner found that the website's primary purpose was to induce investors to contact Blue Flame regarding the offerings. Given the nature of the representations posted on the website, we conclude that the trial court did not abuse its discretion in holding that reliable, probative, and substantial evidence supported this finding.

{¶ 54} Appellees, however, argue that the Blue Flame website contained nothing more than generic information about their "products," which Rule 502 does not prohibit. An issuer may promote its products and services, as long as the issuer does not also use the promotion to solicit offers for the sale of the issuer's securities. Printing Enterprises Mgt. Science, Inc., SEC No–Action Letter (Apr. 25, 1983). However, this rule of law does not apply to the instant case because the "products" marketed on the Blue Flame website were securities, which the website described in glowing terms in order to lure investors.

{¶ 55} As the first step in a campaign to effect the sale of securities, the publicly available website constituted a general solicitation and advertisement that appellees used to offer securities. Accordingly, the Blue Flame website, having rendered affirmative answers to both Rule 502 inquiries, violates Rule 502 and disqualifies appellees' offerings from the Rule 506 exemption.[6] Necessarily, then, NSMIA does not preempt the Division's regulation of appellees' offerings.

{¶ 56} Lacking a basis on which to claim express preemption, appellees next argue that although not explicitly stated in NSMIA, Congress intended the SEC to be the sole adjudicator of whether a security is a covered security. In so arguing, appellees attempt to co-opt into the securities field the *Garmon* preemption doctrine, which protects the primary jurisdiction of the National Labor Relations Board ("NLRB") to determine in the first instance what kind of conduct is either prohibited or protected by the National Labor Relations Act ("NLRA"). *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon* (1959), 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775. See, also, *Bldg. & Constr. Trades Council v. Associated Builders & Contrs. of Massachusetts/Rhode Island, Inc.* (1993), 507 U.S. 218, 224–225, 113 S.Ct. 1190, 122 L.Ed.2d 565 (explaining the *Garmon* preemption doctrine). The Supreme Court created the *Garmon* rule to prevent state interference with certain national labor relations policy, the regulation of which Congress explicitly placed within the control of the NLRB. *Garmon* at 242, 79 S.Ct. 773, 3 L.Ed.2d 775. However, unlike the NLRB, the SEC is not vested with exclusive power to regulate securities policy for the entire nation, thus eliminating any room for state regulation.[7] Because the SEC lacks an express mandate to alone administer the issuance and sale of securities, we decline to apply the *Garmon* preemption doctrine here.

{¶ 57} Moreover, because Congress has not established the SEC as the exclusive federal forum to adjudicate securities issues, we decline to find that the preemption question is jurisdictional in this matter. Appellees argue that interpreting NSMIA so that preemption is dependent upon appellees' eligibility for exemption makes subject-matter jurisdiction contingent upon the merits of the case. As subject-matter jurisdiction is a threshold issue and must be determined prior to the merits, appellees assert that this court's interpretation of NSMIA is wrong. However, appellees' argument erroneously equates preemption with jurisdiction. Generally, state tribunals have the authority to decide

---

6. Thus, we need not analyze whether the article contained on "The Bull and Bear Financial Report" website also constitutes general solicitation or general advertising.

7. Not only did NSMIA leave regulation of non-"covered securities" to the states, but it also delegated to the states regulation of any fraud in connection with all securities. See Section 77r(c)(1), Title 15, U.S.Code.

questions of federal law, including questions of federal preemption. *El Paso Natural Gas Co. v. Neztsosie* (1999), 526 U.S. 473, 486, 119 S.Ct. 1430, 143 L.Ed.2d 635, fn. 7 ("Under normal circumstances, * * * state courts * * * can and do decide questions of federal law, and there is no reason to think that questions of federal preemption are any different"). A state tribunal is not deprived of jurisdiction to decide federal questions unless Congress intends a federal forum to be the exclusive jurisdiction in an area, such as it did in the case of the NLRB. See *Internatl. Longshoremen's Assn., AFL–CIO v. Davis* (1986), 476 U.S. 380, 391, 106 S.Ct. 1904, 90 L.Ed.2d 389 (holding that preemption under *Garmon* extinguishes state jurisdiction). In Section 77r, however, Congress has not expressed such an intention, and in fact, has merely designated a choice of federal law over state law. Therefore, in this matter, preemption is unrelated to jurisdiction, and jurisdiction remains a threshold question, independent from the merits of the regulatory action.

{¶ 58} Because federal law does not preempt the Division's application of Ohio law to regulate the offer and sale of appellees' securities, we sustain the Division's second assignment of error.

{¶ 59} We next turn to the Division's fourth assignment of error, by which the Division argues that the trial court erred in finding appellees' offerings exempt under Ohio Adm.Code 1301:6–3–03(E)(8). As we stated above, R.C. 1707.44(C)(1) prohibits anyone from knowingly selling or offering for sale a security that is not the subject matter of one of the transactions exempted in R.C. 1707.03. Along with exempting securities transactions that satisfy Rule 506, R.C. 1707.03 exempts transactions "if the division by rule finds that registration is not necessary or appropriate in the public interest or for the protection of investors." R.C. 1707.03(V). One such exemption is Ohio Adm.Code 1301:6–3–03(E)(8) (the "internet exemption"), which states:

> The offer of securities by an issuer on the internet, or similar electronic medium, is exempt pursuant to division (V) of section 1707.03 of the Revised Code, provided that:
> (a) The offer of securities indicates, directly or indirectly, that securities are not being offered to any person in this state and the issuer does not otherwise attempt to sell securities in this state;
> (b) The offer of securities is not specifically directed to any person in this state by, or on behalf of, the issuer; and
> (c) No sales of securities are made in this state as a result of the offer of securities until the securities have been registered by description, qualification or coordination, or are subject matter of a transaction that has been registered by description, or are otherwise exempt or are subject matter of an exempt transaction, and a final prospectus, offering circular or form U–7, if required

under the Ohio Securities Act or division regulations, has been delivered to persons in this state prior to such sale.

{¶ 60} In determining whether appellees' securities transactions fit within this exemption, the trial court focused upon the third element, and in particular, the requirement that the issuer not sell any securities in Ohio "as a result of the offer" posted on the internet until the issuer registers its offering or satisfies an exemption. The trial court found that the record before the Division did not include any evidence that an Ohio investor purchased a security interest from appellees as a result of the websites at issue. Placing the burden of proving the exemption upon the state, the trial court concluded that appellees were entitled to the internet exemption because the state failed to provide reliable, probative, and substantial evidence as to the third element.

{¶ 61} The Division argues that the trial court erred when it imposed the burden to prove the exemption upon the Division, instead of appellees. We agree. "The absence of an applicable exemption is not an element of [R.C. 1707.44(C)(1) ]; rather, entitlement to such an exemption is an affirmative defense[,] which must be raised by the defendant." *Chiles v. M.C. Capital Corp.* (1994), 95 Ohio App.3d 485, 496, 642 N.E.2d 1115. Further, not only must an issuer raise the exemption as a defense, it must also bear the burden of proving the exemption. *Baker v. Columbiana Cty. Aud.,* Franklin App. No. 03AP–552, 2004-Ohio-839, 2004 WL 344066, at ¶ 38 ("In an administrative proceeding, the party asserting the affirmative bears the burden of proof"); *Smith v. Columbus,* Franklin App. No. 02AP–1219, 2003-Ohio-3303, 2003 WL 21454394, at ¶ 24 (" 'It is a fundamental concept in administrative law and procedure that the party asserting the affirmative of an issue bears the burden of proof' ").

{¶ 62} In the case at bar, appellees had the burden of establishing that they did not make any sales in Ohio as a result of the website, and for that matter, that they did not "otherwise attempt to sell securities" in Ohio—a requirement of the first element of the internet exemption. Given the absence of evidence as to both of these elements, appellees failed to meet their burden and cannot claim the benefit of the internet exemption. Accordingly, we sustain the Division's fourth assignment of error.

{¶ 63} Although the remainder of the Division's assignments of error also relate to the internet exemption, we find no merit in any of them. First, by the Division's first assignment of error, it argues that the trial court erred in reaching its own findings of fact rather than deferring to the hearing examiner's findings. Specifically, the Division asserts that the trial court erred in stating that the record lacked any evidence proving that an Ohio resident purchased appellees' securities as a result of the websites at issue. The Division characterizes this statement as a factual finding, but, in reality, it is merely the trial court's

evaluation of the state of the record. In evaluating whether the record contains certain evidence, the trial court is not making factual findings, but instead, is fulfilling its duty under R.C. 119.12 to determine whether the Commissioner's cease-and-desist order is supported by reliable, probative, and substantial evidence. Accordingly, we overrule the Division's first assignment of error.

{¶ 64} Second, we address the Division's fifth assignment of error, by which the Division argues that the trial court imposed a heightened criminal burden of proof on it. The Division, however, mistakes the trial court's allocation of the burden of proof for imposition of a heightened burden of proof. As we explained above, the trial court erred in placing the burden to prove the exemptions on the Division. However, the trial court did not erroneously increase the burden appropriately allocated to the Division, i.e., the burden to establish the elements of an R.C. 1707.44(C)(1) violation. Accordingly, we overrule the Division's fifth assignment of error.

{¶ 65} Finally, turning to the Division's sixth assignment of error, we must consider whether the trial court erred in rejecting as "immaterial" one of the Division's objections to the magistrate's decision. After addressing the merits of the Division's argument that the magistrate applied the wrong burden of proof, the trial court stated that "[i]n any event, this objection is immaterial in light of the preemption by federal law." We interpret this statement to mean that the trial court found an argument regarding exemption moot because its analysis of the preemption issue required judgment in appellees' favor. Although our analysis necessitated resolution of the exemption issue on the merits, we cannot find error with the disputed statement in the context of the trial court's analysis. Therefore, we overrule the Division's sixth assignment of error.

{¶ 66} Because we have resolved all of the Division's assignments of error in such a way as to require partial reversal of the trial court's decision, we must address appellees' sole cross-assignment of error. By this cross-assignment of error, appellees argue that they qualified for the Rule 506 and, concurrently, the R.C. 1707.03(X) exemptions. As we held above, appellees engaged in general solicitation and advertising, thus making themselves ineligible for the relevant exemptions. Accordingly, we overrule appellees' sole assignment of error.

{¶ 67} For the foregoing reasons, we sustain the Division's second and fourth assignments of error, overrule the Division's first, fifth, and sixth assignments of error, and sustain in part and overrule in part the Division's third assignment of error. Furthermore, we overrule appellees' conditional cross-assignment of error. Based upon our resolution of the assignments of error, we affirm in part and reverse in part the trial court's judgment, and we remand this cause to the

trial court with instructions to order the Division to issue an order consistent with this opinion.

> Judgment reversed in part
> and affirmed in part,
> and cause remanded.

BROWN and TRAVIS, JJ., concur.