978 F.2d 1115
 61 USLW 2348, Fed. Sec. L. Rep. P 97,049
 Thomas HOLDEN; Thomas Nokes; Robert Maier; Steven S.
Hallock; Eugene H. Gallagher; Mark Manlove;
Warren F. Cappel; Phillips J.
Goodenough, Plaintiffs/Appellants,
v.
Robert R. HAGOPIAN, an individual; et al., Defendant,
and
Thomas R. Harnett, an individual; Security Pacific National
Bank, a National Association; Graves, Allen, Cornelius &
Celestre, a partnership; Losey & Thomson, a partnership;
Gery Gomez, Defendants/Appellees.
 No. 90-15183.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted, July 15, 1992.
Submission deferred July 15, 1992.
Resubmitted Oct. 26, 1992.
Decided Nov. 2, 1992.
 
 Stuart A. Knowles, Wilson, Ryan & Campilongo, San Francisco, Cal., for plaintiffs-appellants.
 Elise M. Pellegrino and Manuel Martinez, Stein, Lubin & Lerner, San Francisco, Cal., for defendant-appellee Thomas A. Harnett.
 David Ian Dalby, Long & Levit, San Francisco, Cal., for defendant-appellee Graves, Allen, Cornelius & Celestre.
 John T. Kinn, Segal & Kirby, Sacramento, Cal., for defendant-appellee Losey and Thomson.
 Robert A. Padway and Michael R. Simmonds, Broad, Schulz, Larson & Wineberg, San Francisco, Cal., for defendant-appellee Security Pacific Nat. Bank.
 Appeal from the United States District Court for the Northern District of California.
 Before: WALLACE, Chief Judge, CHOY, and POOLE, Circuit Judges.
 CHOY, Circuit Judge:
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 1
 On December 27, 1988 plaintiffs/appellants filed a complaint against defendants/appellees alleging violations of sections 12(1) and 12(2) of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. section 77l(1),(2), and section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), as well as various violations of California state law.[1] On May 8, 1989 the district court dismissed the complaint with leave to amend and, in particular, dismissed the causes of action alleging federal securities law violations for failure to state a claim upon which relief could be granted. It based its ruling on Matek v. Murat, 862 F.2d 720 (9th Cir.1988), in which we adopted only the first part of the three-part test set out by the Fifth Circuit in Williamson v. Tucker, 645 F.2d 404 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).
 
 
 2
 Plaintiffs' first amended complaint, filed on April 28, 1989, with a few exceptions, contained the same allegations as the original complaint. On October 13, 1989, again basing its decision on Matek, the district court entered an order pursuant to Federal Rule of Civil Procedure 12(b)(6) in favor of Security Pacific, Gomez, and Graves, Allen dismissing with prejudice the federal securities causes of action.
 
 
 3
 On October 25, 1989, plaintiffs moved for reconsideration arguing that our en banc decision in Hocking v. Dubois, 885 F.2d 1449 (9th Cir.1989), cert. denied, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990), effectively overruled the court's opinion in Matek, that Hocking now was the controlling applicable law in this Circuit, and under Hocking that plaintiffs' first amended complaint stated a claim for relief.
 
 
 4
 At a December 1, 1989 hearing, the district court denied the motion for reconsideration and ruled that, even under the three-factor Williamson test that plaintiffs claimed was adopted in Hocking, their first amended complaint failed to plead facts supporting a finding that their partnership interests in Kentucky Thoroughbred Associates ("KTA") were "securities" as defined in the 1933 and 1934 Acts. On January 26, 1990 the district court entered an Order denying the motion for reconsideration. On the same date, the district court entered a final order dismissing with prejudice the First Amended Complaint as to Harnett and Losey & Thompson. Appellants filed their notice of appeal on February 6, 1990. Lastly, on September 9, 1992, the district court entered a final judgment of dismissal in favor of Hagopian and the Affiliates. We affirm.
 
 II. JURISDICTION AND STANDARD OF REVIEW
 
 5
 The district court had jurisdiction over these federal securities law claims pursuant to 28 U.S.C. § 1331. We have jurisdiction over this appeal, which was timely filed as to the district court's January 26, 1990, order of dismissal, pursuant to 28 U.S.C. § 1291. Although the initial appeal was premature as to Hagopian and the Associates, following the district court's September 6, 1992, order of dismissal we have jurisdiction pursuant to section 1331, as "subsequent events can validate a prematurely filed appeal." Ethridge v. Hooker House Restaurant, 861 F.2d 1389, 1402 (9th Cir.1988) (internal quotation omitted).
 
 
 6
 A district court's dismissal for failure to state a claim pursuant to Rule 12(b)(6) is a ruling on a question of law that we review de novo. Kruso v. International Tel. & Tel., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990); Hartford Accident & Indem. Co. v. Continental Nat'l Am. Ins. Cos., 861 F.2d 1184, 1185 (9th Cir.1988). Our review is limited to the contents of the complaint, Love v. United States, 915 F.2d 1242, 1245 (9th Cir.1989); however, material that properly is submitted as part of the complaint also may be considered. Hal Roach Studios v. Richard Feiner & Co., 896 F.2d 1542, 1555 n. 19 (9th Cir.1989) (citation omitted). We must presume all factual allegations of the complaint are true and draw all reasonable inferences in favor of the nonmoving party. Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987); see Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).
 
 III. ANALYSIS
 
 7
 In order to make out a claim under federal securities laws, as a threshold matter, investors must demonstrate that promoters' alleged misrepresentations or omissions were made in connection with the purchase or sale of a "security." Section 2 of the 1933 Act, 15 U.S.C. § 77b(1)(1981), and section 3 of the 1934 Act, 15 U.S.C. § 78c(a)(10)(1981), define the term "security" similarly and include within their definitions any "investment contract."[2]
 
 
 8
 Because "general partnership interests" are not explicitly enumerated as "securities" in these definitions, the question remains whether, nonetheless, they are included within that definition because they are "investment contracts."[3] In SEC v. W.J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court set out the three-part definition of an investment contract: "[A]n investment contract for the purposes of the Securities Act means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Howey, 328 U.S. at 298-99, 66 S.Ct. at 1102-03.[4]
 
 
 9
 In determining that the KTA partnership interests were not securities the district court relied on our holding in Matek. Appellants argue, as they did in their motion for reconsideration, that our subsequent en banc opinion in Hocking implicitly overruled Matek, and that the district court erred in evaluating whether appellants' general partnership interests were investment contracts under Matek rather than Hocking.
 
 
 10
 We recently settled this question in Koch v. Hankins, 928 F.2d 1471 (9th Cir.1991), in which we held that the en banc opinion in Hocking indeed replaces Matek as controlling in the Circuit. Id. at 1476-78. We therefore look to Hocking when evaluating appellants' complaint under the third part of the Howey definition.
 
 
 11
 In Hocking we adopted the three-prong test set out by the Fifth Circuit in Williamson, 645 F.2d at 404.[5] The heart of this inquiry is whether, although on the face of the partnership agreement the investor theoretically retains substantial control over the investment and an ability to protect the investment from the managing partner or hired manager, the investor nonetheless can demonstrate such dependence on the promoter or on a third party that the investor was in fact unable to exercise meaningful partnership powers. Id. at 424.[6]
 
 
 12
 Under the first prong of the Williamson test our inquiry is limited to an examination of the legal powers afforded the investor by the partnership agreement and other formal documents that comprised the partnership agreement or arrangement. Koch, 928 F.2d at 1478. The Partnership Agreement and the Employment Agreement between the KTA and Hagopian, which made Hagopian Administrative Coordinator of the partnership, are the primary documents that set out the legal responsibility and authority of the general partners to control KTA.[7]
 
 
 13
 These documents afford appellants significant legal power and control over partnership matters.[8] A substantial number of partnership acts may be taken only after a majority vote of the partners to wit: all decisions respecting partnership business; the transfer, sale, or encumbrance of partnership interests; compensation of a partner for work on behalf of the partnership; and the empowerment and direction of one or more partners or an agent to negotiate and conclude sales of property. Furthermore, any amendment of the articles of partnership requires approval of sixty percent of the partners, while seventy-five percent of the partnership has the power to close the partnership once it has retained a certain amount of capital. Finally, partners retained reasonable access to the partnership books maintained at KTA's principal office.
 
 
 14
 Partners also retain substantial authority under the terms of Hagopian's employment contract. The contract itself limits Hagopian's functions to clerical and ministerial tasks, and his authority to enter into contracts or to make promises on behalf of the partnership is circumscribed by requiring KTA's express, written authority. Perhaps most importantly, the partnership retains the power to dismiss Hagopian at any time during his five-year contract for any or no reason.[9]
 
 
 15
 Finally, the powers and duties of the general partners under the KTA partnership arrangement are in large part analogous to, or at least in substance coextensive with, those in the partnership arrangements at issue in Koch, Hocking, and Matek. As a legal matter, they afford the investors responsibility and control over the partnership's horsebreeding and horseracing operations. Thus, because the documents do not leave appellants with "so little power as to place [them] in a position analogous to a limited partner," Hocking, 885 F.2d at 1461, the first factor in Williamson weighs against our finding that appellants expected profits produced, in large measure, by the essential efforts of others.
 
 
 16
 Under the second part of Williamson, we inquire whether the partner is so inexperienced and unknowledgeable in business affairs as to be incapable of intelligently exercising his or her partnership powers. Williamson, 645 F.2d at 424. Appellants contend that they are dependent on Hagopian because they are inexperienced in horsebreeding and thoroughbred racing.
 
 
 17
 Appellants have misconstrued and improperly narrowed the relevant inquiry under this part of Williamson. The proper inquiry is whether the partners are inexperienced or unknowledgeable "in business affairs" generally, not whether they are experienced and sophisticated in the particular industry or area in which the partnership engages and they have invested. Koch, 928 F.2d at 1479; Deutsch Energy, 813 F.2d at 1570; Williamson, 645 F.2d at 423.
 
 
 18
 Neither appellants' brief on appeal nor their first amended complaint contains allegations or facts showing that they lack general business experience or are unknowledgeable about business generally. In fact, the only evidence in the record regarding investors' general business experience and sophistication--the Subscription Agreement completed by each appellant as a condition to their investment in KTA--indicates that they considered themselves experienced in general business matters.
 
 
 19
 Appellants' second contention in support of their showing under part two, is that their partnership investments were "passive investments in horsebreeding operations located a considerable distance from their residences." Appellants obviously lifted this language directly from our opinion and discussion in Hocking of the second Williamson factor. Hocking, 885 F.2d at 1461.
 
 
 20
 Although we are obliged to presume that all factual allegations in appellants' complaint are true, Usher, 828 F.2d at 561, we do not "have to accept every allegation in the complaint as true in considering its sufficiency; rather, ... [we] will examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff." Brian Clewer, Inc. v. Pan American World Airways, Inc., 674 F.Supp. 782, 785 (C.D.Cal.1986) (citing Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 at 595-97); accord Swanson v. Bixler, 750 F.2d 810, 813 (10th Cir.1984) ("All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."); Benson v. Arizona State Bd. of Dental Examiners, 673 F.2d 272, 275-76 (9th Cir.1982) (court need not accept conclusory legal assertions); McKinney v. DeBord, 507 F.2d 501, 503 (9th Cir.1974) ("in construing a complaint most favorably for the plaintiff, a court need not give a plaintiff the benefit of every conceivable doubt; rather, a court is required only to draw every reasonable or warranted factual inference in the plaintiff's favor"); cf. Maisano v. United States, 908 F.2d 408, 410 (9th Cir.1990) (conclusory allegations insufficient to state claim for relief under I.R.C. § 7431); Sherman v. Yakahi, 549 F.2d 1287, 1290 (9th Cir.1977) ("Conclusory allegations, unsupported by facts, [will be] rejected as insufficient to state a claim under the Civil Rights Act.").
 
 
 21
 The above-noted statement in Hocking is the conclusion that we drew on the basis of facts pled by the investor in that case. In Hocking, we concluded that Hocking was a "passive" investor because the facts pled in his complaint and evidence he presented in conjunction with a motion for summary judgment raised an issue regarding his status as an unsophisticated and inexperienced investor. Appellants in this case have pled no such facts and thus, have not made out a case under Williamson part two. Appellants cannot reasonably expect this court to hold that they have demonstrated the existence of a question of fact by merely mimicking our conclusion based upon the facts in another case.[10]
 
 
 22
 Finally, under Williamson part three we examine whether the partners were "so dependent on some unique entrepreneurial or management ability of the promoter or manager that ... [they] cannot replace the manager of the enterprise or otherwise exercise meaningful partnership ... powers." Williamson, 645 F.2d at 424. Appellants must show that they were dependent on some "non-replaceable expertise" on the part of the promoter or manager; that "there is no reasonable replacement for the investments' manager." Id. at 423. Under this standard, appellants also have failed to raise an issue of fact.
 
 
 23
 Appellants argue that, because of the way the KTA partnership was managed, "it was virtually impossible even for any one of the general partner [sic] to manage its interests separately or to replace the [sic] Hagopian as the Partnership manager." In fashioning this argument, they analogize between the circumstances of this case and those in Hocking, 885 F.2d 1449.
 
 
 24
 Our review of Hocking and Koch v. Hankins, 928 F.2d 1471 (9th Cir.1991), a case in which under Williamson part three we found the investment arrangement analogous to that in Hocking, confirms that appellants' analogy fails for a number of reasons.
 
 
 25
 First, the mechanism available to KTA general partners for changing the management of the partnership is distinguishable from those in Hocking and Koch. The KTA partnership arrangement provides that, pursuant to his employment contract, Hagopian may be fired from his position as Administrative Coordinator at any time "with or without cause," upon thirty days notice. Moreover, in the event of his termination, that contract requires Hagopian to assist the general partners in finding an adequate replacement for him. Finally, the KTA Articles of Partnership provide that all decisions regarding partnership matters are to be made by a majority of the partners unless a greater percentage otherwise was required. Thus, compared with the stiffer seventy-five percent vote required for the owners to change management of the pooling arrangement in Hocking and the complete absence of any formal mechanism for making such a change in Koch, the KTA general partners have the power to fire and replace Hagopian with a simple majority vote. Koch, 928 F.2d at 1480-81; Hocking, 885 F.2d at 1453.
 
 
 26
 Second, and more importantly, appellants fail to discern the fundamental structural difference between the investment arrangements in Hocking and Koch and that of the KTA partnership. Appellants argue that they are dependent on Hagopian's unique management ability because it is neither economically feasible for each general partner to hire an individual advisor to raise a single horse nor is it possible for the general partners, who lack the requisite expertise or equipment to raise the horses, to do so on their own.
 
 
 27
 This argument is grounded in the faulty assumption that firing Hagopian will result in the KTA general partners owning or renting the individual horses once under Hagopian's management. In Hocking and Koch when investors withdrew from the larger scheme or the current management arrangement changed, individual investors were left with an investment--a single condominium unit in a hotel-like resort or a general partnership in a small jojoba farm--which, absent the larger management scheme of the pooling arrangement or plantation, was incapable of producing the profit investors expected originally. Koch, 928 F.2d at 1480; Hocking, 885 F.2d at 1461.
 
 
 28
 The KTA general partnership, in contrast, is not a pooling arrangement for the management of horses owned by the individual investor general partners; the partnership itself owns or rents the horses. Thus, unlike in Hocking and Koch, change of KTA management--firing Hagopian as administrative coordinator--would not result, as appellants' argument necessarily requires, in the general partners each having responsibility for breeding a single horse. Rather, KTA would remain the owner or renter of the horses and the general partners would have the option of appointing a new administrative coordinator by a majority vote.
 
 
 29
 Given these fundamental differences, appellants' reliance on the court's reasoning in Hocking is illogical and misplaced.
 
 
 30
 The question nonetheless remains whether appellants otherwise have pled facts to support our finding that there is no other reasonable replacement for Hagopian.
 
 
 31
 Appellants argue that Hagopian is not replaceable because the general partners themselves do not have the necessary expertise or equipment to raise horses. Appellants' inquiry, however, is too narrow. Under this part of Williamson, investors must show that "there is no reasonable replacement" for the manager. Williamson, 645 F.2d at 423. A showing that the general partners do not possess the skills or abilities required to fill the manager's shoes simply is insufficient.
 
 
 32
 In the first amended complaint appellants also make a number of broad statements indicating that, in investing in KTA, they were relying on Hagopian's and the Affiliates' expertise. While these statements perhaps establish that Hagopian possessed the required skill and knowledge to manage KTA and that the general partners themselves were not skilled to replace him, appellants nowhere assert that Hagopian is uniquely capable of managing KTA and that they are incapable, within reasonable limits, of finding any replacement for him. Vague statements like these are insufficient to raise a question regarding appellants' dependence on Hagopian's unique or irreplaceable expertise. See Williamson, 645 F.2d at 425.
 
 
 33
 Finally, appellants cite the facts that Hagopian prearranged leases of mares and stallion seasons by the general partnership (i.e. the Mare Lease Agreements) before they invested, that he was the sole manager of the partnership and made all of the decisions concerning raising the horses only consulting the general partners after the fact, and that they were denied access to information regarding the partnership as indications that they have met the third-part of the Williamson test.
 
 
 34
 These allegations, however, merely show that appellants chose to be passive and did not actively utilize the legal powers afforded them by the partnership arrangement and, again, that Hagopian was an able manager. Appellants' failure to participate in the partnership's decisions and to obtain information regarding its operations may prove that they sat on their rights as general partners but it does not support the conclusion that Hagopian is uniquely qualified to manage KTA within the meaning of Williamson's third prong.
 
 
 35
 Because appellants have failed to plead allegations sufficient to establish that their general partnership interests in KTA are "securities" entitled to protection under the 1933 and 1934 Acts, we affirm the district court's dismissal under Fed.R.Civ.P. 12(b)(6).
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 On May 8, 1990, pursuant to a stipulation under Federal Rule of Appellate Procedure 42(b) entered into by appellants and appellee Security Pacific Bank, we entered an order dismissing Security Pacific from this appeal. On August 31, 1990 we entered an order dismissing the appeal against appellee Gery Gomez. On September 21, 1990 appellants Thomas Holden and Phillip Goodenough and appellees Thomas R. Harnett, Losey & Thompson; and Graves, Allen, Cornelius & Celestre ("Graves, Allen") stipulated to a dismissal of the appeal with prejudice and we ordered dismissal of the appeal as between those parties. On July 9, 1990 we granted Security Pacific's motion to dismiss for lack of jurisdiction, as joined in by Graves, Allen and Gomez, and dismissed the appeal against Graves, Allen--the only party to the motion not already dismissed from the appeal--for lack of jurisdiction
 The remaining appellants ("appellants") include: Thomas Nokes, Robert Maier, Steven S. Hallock, Eugene H. Gallagher, Mark Manlove, and Warren F. Cappel. The remaining appellees ("appellees") include: Robert R. Hagopian; Thomas R. Harnett; Losey & Thompson; and the seven companies allegedly owned or controlled wholly or in part by Hagopian (hereinafter "the Affiliates"), including First Reserve Corporation; The Kentucky Horse Center, Inc.; American Equine Corporation; Kentucky Breeders, Inc.; Kentucky Breeders Associates; Broodstock Research, Inc.; and, Spendthrift Farms. The appeal also remains as between appellants Holden and Goodenough and appellees Hagopian and the Affiliates.
 
 
 [2]
 Courts have ruled that these definitions are functional equivalents. Tcherepnin v. Knight, 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967); Deutsch Energy Co. v. Mazur, 813 F.2d 1567, 1569 n. 2 (9th Cir.1987)
 
 
 [3]
 The term "investment contract" has been interpreted broadly to reach "[n]ovel, uncommon, or irregular devices, whatever they appear to be...." SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1941). Moreover, "[i]t embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." SEC v. W.J. Howey Co., 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946). In determining whether interests are investment contracts, we focus on the economic realities of the underlying transaction and not on the name it carries. United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975); Tcherepnin, 389 U.S. at 336, 88 S.Ct. at 553; Matek, 862 F.2d at 724
 
 
 [4]
 In SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), we interpreted the word "solely" in the third part of the Howey definition, noting that it "should not be read as a strict or literal limitation on the definition of an investment contract." Id. at 482. We thus adopted a more "realistic" approach that examines whether "the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failure of success or the enterprise." Id
 The Third, Fifth, Sixth, and Tenth Circuits have since adopted our interpretation of Howey's third part. Goodwin v. Elkins Co., 730 F.2d 99, 103 (3d Cir.), cert. denied, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984); Williamson, 645 F.2d at 418; Odom v. Slavik, 703 F.2d 212, 215 (6th Cir.1983) (per curiam); Crowley v. Montgomery Ward Co., 570 F.2d 875, 877 (10th Cir.1975). The Supreme Court has noted, but not expressed its view on the Turner interpretation. Forman, 421 U.S. at 852 n. 16, 95 S.Ct. at 2060 n. 16.
 
 
 [5]
 In Williamson the court held that:
 A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or management ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.
 645 F.2d at 424. These three factors are not exclusive and under different facts or legal arrangements other factors could also give rise to such a dependence on the promoter or manager. Id. at 424 n. 15; Hocking, 885 F.2d at 1460.
 
 
 [6]
 The focus under Williamson is on the investor's expectations at the time of the original investment, and "is not directed at what actually transpires after the investment was made, i.e., whether the investor later decides to be passive or to delegate all powers and duties to a promoter or managing partner." Koch, 928 F.2d at 1477; Matek, 862 F.2d at 729; Williamson, 645 F.2d at 424 n. 14 ("one would have to show that the reliance on the manager which forms the basis of the partner's expectations was an understanding in the original transaction, and not some subsequent decision to delegate partnership duties.")
 
 
 [7]
 We reject appellants' argument that the Mare Lease Agreements also are part of the partnership "arrangement" for the purpose of Williamson prong one. These agreements neither establish how the legal powers and duties in this partnership are divided nor do they alter the powers to control the partnership business that are afforded the general partners under the Articles of Partnership and Hagopian's employment contract. The fact that Hagopian entered into lease agreements prior to appellants' investments does not alter the partners' legal powers to affect the partnership's decisions under the partnership agreement. As such, and as admitted by appellants in their first amended complaint, the partners have the power to select investments and, thus, presumably could effect a change in the leases by a majority vote
 Ultimately, appellants' allegations regarding the Mare Lease Agreements relate to the merit of their claim that Hagopian misrepresented and failed to disclose certain facts and therefore is premature.
 
 
 [8]
 In their first amended complaint appellants openly acknowledge this fact stating that "the partnership agreement ostensibly gave the Partners rights in the management of the Partnership, including the right to vote on Partnership business, select investments, retain a new administrative partner and to borrow funds...." First Amended Complaint p 39
 
 
 [9]
 The fact that appellees previously promoted limited partnership horsebreeding and horseracing programs "virtually identical" to the KTA general partnership is irrelevant to this inquiry. Under Williamson prong one our concern and focus is on the terms of the general partnership arrangement in which appellants invested and on whether that arrangement afforded the partners legal control over the instant partnership, not on other partnerships formed or managed by the managers or promoters on prior occasions
 
 
 [10]
 Even more fundamentally, recognition that investors' naked allegation that they were "passive" as adequate to make out a case under Williamson prong two, risks shifting our inquiry under Williamson from its intended focus on the investors' expectations at the time of the investment, to their "de facto post-investment conduct." Koch, 928 F.2d at 1477 n. 9; Matek, 862 F.2d at 729 (acknowledging promoters' concerns that "an interest marketed as a general partnership might thus be transformed into a security simply because its holder is not diligent or knowledgeable in exercising his rights under the agreement"); Williamson, 645 F.2d at 424 n. 14; see C.M. Joiner Leasing Corp., 320 U.S. at 352-53, 64 S.Ct. at 124-25