[No. A117513. First Dist., Div. One. Apr. 28, 2008.]

CONSOLIDATED MANAGEMENT GROUP, LLC, et al., Plaintiffs and Appellants, v.
DEPARTMENT OF CORPORATIONS, Defendant and Respondent.

**COUNSEL**

Baker & McKenzie, Laura J. O'Rourke, Joel Held, William R. Daugherty and Christopher Van Gundy for Plaintiffs and Appellants.

Preston DuFauchard and Edward Kelly Shinnick for Defendant and Respondent.

Rex A. Staples, Stephen W. Hall, Joseph Brady, Lesley Walker and Joseph A. Hearst for North American Securities Administrators Association, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**MARCHIANO, P. J.**—Consolidated Management Group, LLC (Consolidated), Consolidated Leasing Hugoton Joint Venture # 2 (Hugoton), and Consolidated Leasing Anadarko Joint Venture (Anadarko; Consolidated, Anadarko, and Hugoton are hereafter referred to collectively as petitioners) appeal from a judgment denying their petition for writ of administrative mandamus. The petition sought to overturn the decision of respondent Department of Corporations (Department) rejecting petitioners' challenge to a Department desist and refrain order with respect to offers and sales of interests in Hugoton and Anadarko.

The issues on appeal are: (1) whether federal law preempts the Department's authority to issue the desist order; and (2) whether the interests in Hugoton

and Anadarko are securities. Most of the cases that have addressed the first issue, including a recent decision by another California Court of Appeal, have found no preemption, and we agree with that majority view. Substantial evidence supported the Department's determination that the interests in question are securities. We affirm for the reasons that we explain below.

## I. BACKGROUND

Consolidated, a Kansas limited liability company with its principal place of business in Hutchinson, Kansas, formed a number of Kansas general partnerships, including Hugoton and Anadarko, that purchase oil and gas exploration and drilling equipment and lease the equipment to oil and gas operators. This case concerns the sale of units of joint venture interests in Hugoton and Anadarko, which have their principal places of business in Wichita, Kansas. The August 5, 2005 private placement memorandum for Hugoton provided for the sale of 116 units at $50,000 per unit; the October 1, 2005 memorandum for Anadarko provided for the sale of 100 units at $62,000 per unit.

In August and November 2005, Consolidated filed with the Department copies of the Form D notices of private placements of securities (rule 506 of Regulation D of the U.S. Securities & Exchange Com.; 17 C.F.R. § 230.506 (2007)) it had filed for Hugoton and Anadarko with the Securities and Exchange Commission (SEC), along with consents to service of process and $300 notice filing fees.

Consolidated retained Guardian Capital Management (Guardian) to raise capital in Northern California for Hugoton and Anadarko, and the Department issued a desist and refrain order in January 2006 against Guardian, Guardian's president, Kenneth Keegan, and Guardian operatives Faber Johnston and Brandon Taylor, as well as Consolidated, Hugoton, and Anadarko. The order charged that these entities and individuals had engaged in general solicitation of the public for the offer and sale of Hugoton and Anadarko units, that the units were securities subject to qualification under California law, and that the securities had been offered and sold without being qualified in violation of Corporations Code section 25110.[1]

Petitioners requested a hearing on the desist and refrain order, which was held in March 2006 before an administrative law judge (ALJ).

Department investigator Jon Wroten testified at the hearing that he was working undercover using an alias on December 1, 2005. He received a call from Faber Johnston. Johnston obtained Wroten's number from a third party

---

[1] Unless otherwise indicated, all further statutory references are to the Corporations Code.

Wroten was investigating. Wroten had told the third party that he owned a sheet rocking company and that he had $20,000 to $30,000 to invest. On December 1, the third party called Wroten and asked if he was interested in information about an investment unrelated to the one they had been discussing. Wroten said, "Yes," and then received the call from Johnston.

Johnston told Wroten that Guardian was under contract with Consolidated to market an oil and gas drilling project called Anadarko, and that the investment could potentially return 21 percent per annum. Johnston said that Consolidated personnel had been drilling for oil for 30 years, and that when they found natural gas instead of oil they had capped the wells. The price of natural gas was rising, Consolidated had drilling equipment and rights to the capped wells, and Anadarko's business would involve leasing the equipment to firms that would extract the natural gas from the wells.

Wroten had no relationship with Johnston prior to the phone call. During the call, Johnston asked Wroten what he did for a living and Wroten said that he had a dry walling company; he did not tell Johnston anything else about himself. Johnston asked if he could send information about the investment, Wroten said, "Yes," and Wroten received over 100 pages of documents from Johnston, including the Anadarko private placement memorandum, promotional materials, and an invitation to participate in a December 6, 2005 conference call with Consolidated's president. The promotional materials included a brochure stating that demand for natural gas was increasing, that Consolidated had "100+ years of industry knowledge" and "proven track record," and that "[w]e are uniquely situated in areas of vast oil and natural gas reserves." Johnston left phone messages for Wroten and sent him a second written solicitation, but Wroten did not communicate with Johnston after their December 1 conversation.

Guardian President Kenneth Keegan confirmed at the hearing that Johnston was authorized by Guardian to send out promotional materials. Keegan testified that shortly after he joined the Los Gatos Chamber of Commerce (Chamber) in July or August of 2005, he purchased mailing labels from the Chamber for its 430 members. The membership mailing list was not available to the general public. Keegan said that Guardian mailed invitations to over 200 Chamber members who "we thought were possibly accredited" investors inviting them to luncheon presentations that sought to generate interest in Hugoton and Anadarko. Keegan said that he knew "quite a few" of the people invited, but admitted that Guardian did not have a preexisting relationship with all of them.

Keegan wrote the Department a letter in October 2005 advising that "[Guardian] is compensated by [Consolidated] for its effort in providing capital

received from accredited investors . . . ." Keegan indicated at the hearing that Guardian did not receive "direct compensation" from Consolidated; Guardian was paid by Balboa Leasing, which was listed on Anadarko's Form D as an entity that would be compensated for the sale of investments. Keegan explained that the money flowed from Consolidated through Balboa Leasing to Guardian.

Keegan testified that he told potential investors they would be required to actively participate in the management of Hugoton and Anadarko. He conceded that some who attended the luncheons had no experience in the oil and gas industry. He acknowledged that he was promoting investments in equipment located "many states away" from where the investors resided, and that the wells where the equipment would be used were in Kansas and Oklahoma.

The ALJ issued a proposed decision denying petitioners' motion to dismiss the desist and refrain order on the ground of federal preemption, finding that the joint venture interests in Hugoton and Anadarko were securities, and concluding the securities were not exempt under Regulation D. The Department adopted the ALJ's proposed decision, and petitioners filed the administrative mandate action herein. In its order denying the petition, the trial court rejected petitioners' preemption argument and found that the joint venture interests were securities.

## II. DISCUSSION

### A. *Preemption*

Under section 25110, "[i]t is unlawful for any person to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified . . . or unless such security or transaction is exempted . . . ." Section 25102.1, subdivision (d) exempts from section 25110 "[a]ny offer or sale of a security with respect to a transaction that is exempt from registration under the Securities Act of 1933 pursuant to Section 18(b)(4)(D) [15 U.S.C. § 77r(b)(4)(D)] of that act," provided that a copy of a completed Form D and a consent to service of process are filed, and a notice filing fee is paid, as was done by Hugoton and Anadarko in this case. Transactions are exempt from registration under the federal statute if they comply with the requirements of Rule 506 of Regulation D (17 C.F.R. § 230.506 (2007)) for limited private placements (15 U.S.C. § 77d(2)), which include a prohibition against any form of general solicitation (17 C.F.R. § 230.502(c) (2007)). Petitioners do not dispute the Department's finding, upheld by the trial court, that interests in Hugoton and Anadarko were offered through general solicitations in contravention of the federal rules for private offerings.

■ Petitioners nevertheless maintain that California is preempted by federal law from requiring that the sales of those interests be qualified as provided in section 25110. Their argument is based on the National Securities Markets Improvement Act of 1996 (NSMIA; 15 U.S.C. § 77r), which preempts state laws requiring the registration or qualification of a "covered security" (15 U.S.C. § 77r(a)(1)), including a security in "a transaction that is exempt from registration under this subchapter pursuant to . . . [¶] . . . [¶] . . . Commission rules or regulations issued under section 4(2) [15 U.S.C. § 77d(2); i.e., Rule 506 of Regulation D]" (15 U.S.C. § 77r(b)(4)(D)). In petitioners' view, any purported offer of securities pursuant to Rule 506 of Regulation D is sufficient to establish preemption, whether or not the offer is implemented in accordance with the requirements of that rule.

Petitioners' preemption argument presents an issue of law as to the Department's jurisdiction in this matter, and we must exercise de novo review with respect to that issue. (See, e.g., *Anserv Ins. Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 205 [99 Cal.Rptr.2d 357]; *Usher v. County of Monterey* (1998) 65 Cal.App.4th 210, 216 [76 Cal.Rptr.2d 274].)

Petitioners' argument is supported by the decision in *Temple v. Gorman* (S.D.Fla. 2002) 201 F.Supp.2d 1238 (*Temple*). The plaintiffs in *Temple* alleged that the defendants had sold unregistered securities in violation of Florida law because, while the defendants had filed a Form D with the SEC for an exempt private placement under Rule 506 of Regulation D, they did not comply with the rule's requirements when they sold the securities. The court found that the plaintiffs' claim was preempted under the NSMIA by virtue of the Form D filing regardless of how the securities were sold, and granted motions to dismiss the complaint. (*Temple, supra*, at p. 1244.)

*Temple* gleaned " '[t]he purpose of Congress,' " the " 'ultimate touchstone in every preemption case' " (*Temple, supra*, 201 F.Supp.2d at p. 1243), from a committee report stating that the NSMIA was intended " 'to further and advance the development of national securities markets and eliminate the costs and burdens of duplicative and unnecessary regulation by, as a general rule, designating the Federal government as the exclusive regulator of national offerings of securities.'. . . [¶] . . . [¶] '[S]ecurities sold in private transactions under section 4(2) of the Securities Act would be "covered securities," and thus preempted, if offered or sold pursuant to a Commission rule or regulation adopted under such section 4(2). The Committee intends that the section 4(2) exemption from State regulation facilitate private placement of securities consistent with the public interest and the protection of investors.' " (201 F.Supp.2d at p. 1243.)

After quoting this legislative history, the court wrote: "Here, Plaintiffs have alleged that Defendants' private placement of securities 'purported to be

exempt from registration pursuant to Rule 506 of Regulation D promulgated by the SEC.'. . . . Construing this allegation in Plaintiffs' favor, the Court finds that the securities in this case were 'offered or sold pursuant to a Commission rule or regulation adopted under section 4(2).' Regardless of whether the private placement actually complied with the substantive requirements of Regulation D or Rule 506, the securities sold to Plaintiffs are federal 'covered securities' because they were sold pursuant to those rules. . . . [¶] . . . [A]ny attempt by Florida to require registration of such securities or securities transaction would be preempted by NSMIA. Congress expressed its intent in NSMIA that federal regulations alone should govern the registration of national securities offerings. Where a Form D was filed with the SEC for a transaction that purported to merit an exemption from federal registration pursuant to Regulation D, Florida law could not require duplicative registration or a transactional exemption from registration." (*Temple, supra,* 201 F.Supp.2d at pp. 1243–1244, citation omitted.)

*Temple* has been followed in a few cases that have not expanded on its analysis. (*Pinnacle Communic. Intern. v. American Fam. Mortg.* (D.Minn. 2006) 417 F.Supp.2d 1073, 1087; *Lillard v. Stockton* (N.D.Okla. 2003) 267 F.Supp.2d 1081, 1115–1116; *Risdall v. Brown-Wilbert, Inc.* (Minn.Ct.App. 2007) 733 N.W.2d 827, 832, review granted Sept. 18, 2007, A06-1233 [2007 Minn. Lexis 552].) However, *Temple* has been rejected in most subsequent cases, including the recent decision in *Apollo Capital Fund LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226 [70 Cal.Rptr.3d 199] (*Apollo*). (*Brown v. Earthboard Sports USA, Inc.* (6th Cir. 2007) 481 F.3d 901, 910–912 (*Brown*); *Grubka v. WebAccess Intern., Inc.* (D.Colo. 2006) 445 F.Supp.2d 1259, 1269–1270 (*Grubka*); *Hamby v. Clearwater Consulting Concepts, LLLP* (E.D.Ark. 2006) 428 F.Supp.2d 915, 921, fn. 2 (*Hamby*); *Buist v. Time Domain Corp.* (Ala. 2005) 926 So.2d 290, 296–297; *In re Blue Flame Energy Corp.* (2006) 171 Ohio App. 3d 514 [2006 Ohio 6892, 871 N.E.2d 1227, 1243–1244] (*Blue Flame*).)

The decisions critical of *Temple* have found no need to go beyond the NSMIA's text and consult its legislative history. (*Brown, supra,* 481 F.3d at p. 912; *Grubka, supra,* 445 F.Supp.2d at p. 1270; *Blue Flame, supra,* 871 N.E.2d at p. 1244.) It is unnecessary to look to the legislative history if a statute is unambiguous (*Grubka, supra,* at p. 1270), and the NSMIA unambiguously defines a "covered security" as one that " '*is exempt* from registration,' " not one that "is sold *pursuant to* a putative exemption" (*Blue Flame,*

*supra*, at p. 1244). Offerings must thus "actually qualify for a valid federal securities registration exemption in order to enjoy NSMIA preemption." (*Brown, supra*, at p. 910.)[2]

These decisions also note how easily state registration requirements could be circumvented if simply claiming that a transaction is exempt produced preemption. "In such a world, state registration requirements could be avoided merely by adding spurious boilerplate language to subscription agreements suggesting that the offerings were 'covered,' or by filing bogus documents with the SEC." (*Brown, supra*, 481 F.3d at p. 911; see also *Grubka, supra*, 445 F.Supp.2d at p. 1270 ["that a defendant could avoid liability under state law simply by declaiming its alleged compliance with Regulation D is an unsavory proposition and would eviscerate the statute"]; *Blue Flame, supra*, 871 N.E.2d at p. 1244 [" 'any con artist could avoid state registration by telling the investor that the offering was a private placement under Rule 506' "; " 'sham Rule 506 offerings would be exempt from state registration . . .' "].) While "Congress indubitably possesses the power to accomplish that end," if Congress had "possessed the political will to preempt state Blue Sky laws in their practical entirety, it would have expressed that decision in the statute's plain text." (*Brown, supra*, at pp. 911, 912.)

■ Like the *Apollo* court we are persuaded by the cases that have declined to follow *Temple*, and we "align ourselves with the authorities which have 'stated the obvious: a security has to actually be a "covered security" before federal preemption applies.' " (*Apollo, supra*, 158 Cal.App.4th at p. 250, quoting *Hamby, supra*, 428 F.Supp.2d at p. 921, fn. 2.)

■ Petitioners contend that the Department, as a state agency, lacks authority to interpret a federal exemption, but a similar argument was persuasively rejected in the *Blue Flame* case. The offeror in *Blue Flame* argued that the NSMIA was implicitly intended to make the SEC sole adjudicator of whether a security is a covered security. (*Blue Flame, supra*, 871 N.E.2d at p. 1247.) However, state tribunals generally have authority to decide questions of federal law, including questions of federal preemption, "unless Congress intends a federal forum to be the exclusive jurisdiction in an area . . . ." (*Id.* at p. 1248.) The NSMIA expresses no such intention and "merely designate[s] a choice of federal law over state law." (871 N.E.2d at p. 1248.)

Petitioners contend that the relevant policy consideration under the NSMIA is not evasion of state registration requirements, but rather avoidance of

---

[2] For the same reasons, petitioners are not entitled to the section 25102.1, subdivision (d) exemption simply because they filed the documents and paid the fees specified in that statute. Section 25102.1, subdivision (d), like the NSMIA's definition of a "covered security," refers to a security in a transaction that "is exempt," which plainly means actually exempt.

costly and potentially inconsistent state proceedings to determine whether purported private offerings are truly exempt. However, this reasoning is no more than a gloss on the legislative history cited in *Temple* and rejected in the other cases. That history does not establish that the burden of state enforcement was considered so detrimental as to outweigh any state concern over sham private offerings. Petitioners submit that the NSMIA's provision preserving state jurisdiction to prosecute enforcement actions involving fraud or deceit, or unlawful conduct by a broker or dealer (15 U.S.C. § 77r(c)(1)), implicitly removes any other state authority over purported private placements. However, if Congress meant to "preempt state Blue Sky laws in their practical entirety" it would have done so expressly (*Brown, supra*, 481 F.3d at p. 912), and not by mere implication.

We therefore independently agree with the Department and the trial court that petitioners' preemption argument is untenable.

B.   *Whether the Joint Venture Interests Are Securities*

Petitioners argue that the Department erred in finding that the joint venture interests are securities. Whether an investment constitutes a security is a question of fact. (*People v. Frederick* (2006) 142 Cal.App.4th 400, 413 [48 Cal.Rptr.3d 585]; *Moreland v. Department of Corporations* (1987) 194 Cal.App.3d 506, 512 [239 Cal.Rptr. 558].) Our review is therefore limited to determining whether the Department's finding was supported by substantial evidence. (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225 [118 Cal.Rptr.2d 187].)[3] In conducting that review, "we examine all relevant evidence in the entire administrative record. [Citation.] We view the evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment. [Citations.]" (*Ibid.*) "[I]t is presumed that the findings and actions of the administrative agency were supported by substantial evidence," and "the burden is on [the] appellant to show there is no substantial evidence whatsoever to support the findings of the [agency]." (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 335–336 [25 Cal.Rptr.2d 842].)

An "investment contract" is among the instruments listed in section 25019's expansive definition of a "security." "In determining whether a transaction is an investment contract, California courts have applied, either separately or together, two distinct tests: (1) the 'risk capital' test described in

---

[3] The Department's finding does not, as petitioners claim, implicate a fundamental vested right so as to mandate independent judicial review. (See generally *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].) The finding does not preclude petitioners from doing business in this state, and they have no fundamental vested right to offer or sell joint venture interests in violation of California's securities laws.

*Silver Hills Country Club v. Sobieski* (1961) 55 Cal.2d 811, 815 [13 Cal.Rptr. 186, 361 P.2d 906], and (2) the federal test described in *SEC v. W.J. Howey Co.* (1946) 328 U.S. 293, 298–299 [90 L.Ed. 1244, 66 S.Ct. 1100]. [Citations.] A transaction is a security if it satisfies either test. [Citation.]" (*Reiswig v. Department of Corporations* (2006) 144 Cal.App.4th 327, 334 [50 Cal.Rptr.3d 386].) Since we conclude that there was substantial evidence to support the Department's finding under the federal test, we need not decide whether the risk capital test was also satisfied.

Under the federal test, an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." (*S. E. C. v. Howey Co., supra*, 328 U.S. at pp. 298–299 (*Howey*).) Profits are deemed to derive " 'solely' from the efforts of others" if "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." (*Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.* (9th Cir. 1973) 474 F.2d 476, 482.) In deciding whether the test is met, "form should be disregarded for substance and the emphasis should be on economic reality." (*Tcherepnin v. Knight* (1967) 389 U.S. 332, 336 [19 L.Ed.2d 564, 88 S.Ct. 548] (*Tcherepnin*).)

■ "The pivotal criterion for distinguishing partnership or joint venture interests, as well as limited liability company membership interests, that are securities from those that are not usually will be the profits 'solely [or substantially] from the efforts of others' element in the *Howey* test. Where profits are to come substantially from the efforts of others (the typical case in a limited partnership), a security will be present. On the other hand, where profits are to come from the joint efforts of partners (the typical case in a general partnership), a security usually will not be present." (II Loss et al., Securities Regulation (4th ed. 2007) Coverage of the Securities Act of 1933, pp. 985–986, fns. omitted.) "In determining whether the investors relied on the efforts of others, we look not only to the partnership agreement itself, but also to other documents structuring the investment, to promotional materials, to oral representations made by the promoters at the time of the investment, and to the practical possibility of the investors exercising the powers they possessed pursuant to the partnership agreements." (*Koch v. Hankins* (9th Cir. 1991) 928 F.2d 1471, 1478 (*Koch*).)

■ The leading case on when a general partnership interest constitutes a security is *Williamson v. Tucker* (5th Cir. 1981) 645 F.2d 404 (*Williamson*). (*Koch, supra*, 928 F.2d at p. 1477; see generally Callison, *Changed Circumstances: Eliminating the Williamson Presumption that General Partnership Interests Are Not Securities* (2003) 58 Bus. Law. 1373, 1376–1378 [surveying

*Williamson*'s adoption in the federal circuits].) Under *Williamson, supra*, at page 424, it is the investor's burden to "demonstrate that, in spite of the partnership form which the investment took, he was so dependent on the promoter or on a third party that he was in fact unable to exercise meaningful partnership powers. A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." (Fn. omitted.) Other factors could also show dependence on the promoter or manager. (*Id.* at p. 424, fn. 15; *Holden v. Hagopian* (9th Cir. 1992) 978 F.2d 1115, 1119 (*Holden*).) The focus under *Williamson* is on investor expectations at the time of the original investment. (*Williamson, supra*, at p. 424, fn. 14; *Holden, supra*, at p. 1119, fn. 6; see also Hazen, The Law of Securities Regulation (rev. 5th ed. 2006) Securities Act Coverage, p. 54 ["[t]he ultimate determination will depend on the ways in which the partnership interests are marketed to the investors"].)

Under the joint venture agreements in this case, Consolidated, as the managing venturer, has authority over the ventures' day-to-day operations, but the other venturers have the right to remove Consolidated as the managing venturer by a majority vote. The agreements provide generally for collective management and control by all of the venturers, and grant the venturers rights of general partners under the Kansas Uniform Partnership Act. Since the agreements distribute power in a manner found in a general partnership rather than a limited partnership, the joint venture interests are not securities under the first *Williamson* factor.

The second factor, involving the knowledge and experience of the investors, has been applied differently in different federal circuits. In the Ninth Circuit, "[t]he proper inquiry is whether the partners are inexperienced or unknowledgeable 'in business affairs' generally, not whether they are experienced and sophisticated in the particular industry or area in which the partnership engages and they have invested." (*Holden, supra*, 978 F.2d at p. 1121.) The Fifth Circuit, on the other hand, interprets its decision in *Williamson* to require that "the investors' expertise . . . be considered in relation to the nature of the underlying venture." (*Long v. Shultz Cattle Co., Inc.* (5th Cir. 1989) 881 F.2d 129, 135 (*Long*); see also *id.* at p. 134, fn. 3.) This approach is based on "*Howey* itself," which "establishes that an investor's generalized business experience does not preclude a finding that the

investor lacked the knowledge or ability to exercise meaningful control over the venture. . . . In *Howey*, the Court noted that the investors were 'business and professional people' . . . but focused on the fact that the investors were 'persons who reside in distant localities and who lack the equipment and experience requisite to the cultivation, harvesting and marketing of the citrus products [in which they invested].' " (*Id.* at pp. 134–135, citation omitted.)

We believe the broader inquiry into investor expertise undertaken in the Fifth Circuit is more appropriate than the Ninth Circuit's narrower approach. (See generally *People ex rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1090 [103 Cal.Rptr.2d 870] [where circuits are split, we are not bound to follow the Ninth Circuit rule].) The Fifth Circuit standard is consonant with *Howey, supra*, 328 U.S. 293 and the remedial purpose of the securities laws (*Tcherepnin, supra*, 389 U.S. at p. 336), and takes into account the reality that general business sophistication does not necessarily equip an investor to manage a specialized enterprise. "Regardless of investors' general business experience, where they are inexperienced in the particular business, they are likely to be relying solely on the efforts of the promoters to obtain their profits." (*S.E.C. v. Merchant Capital, LLC* (11th Cir. 2007) 483 F.3d 747, 762 [citing *Long*].) Petitioners claim that it is "absurd" to have the existence of a security turn on the identity of the investor, but the approach they advocate, like the one we adopt, also focuses on the qualifications of individual investors—the only difference is in the standard by which the expertise is judged.

Accordingly, Keegan's acknowledgement that Chamber members attending Guardian's promotional lunches had no experience in the oil and gas industry supported a factual finding that petitioners were soliciting investments from people who would, as a practical matter, lack the knowledge to effectively exercise the managerial powers conferred by the joint venture agreements. (See generally *Koch, supra*, 928 F.2d at p. 1479 [*Williamson* factor of investor expertise is a question of fact].) Wroten's testimony about Johnston's solicitation supported a finding of lack of investor expertise even under the Ninth Circuit rule, because Johnston did not know whether Wroten was a sophisticated businessperson, but only that he had a sheet rocking company and $20,000 to $30,000 to invest.[4]

■ Investors in the petitioners' ventures had to initial a paragraph in a questionnaire "warrant[ing] and represent[ing] that he or she possesses

---

[4] In practice, a promotion scheme that sells investments to unknowledgeable members of the general public cannot escape the reach of the securities laws by simply labeling itself a joint venture or general partnership. Such offerees or investors would naturally expect profits to be derived from the efforts of others in spite of partnership powers nominally retained by them. (*Williamson, supra*, 645 F.2d at p. 423.)

extensive experience and knowledge in business affairs such that he or she is capable of intelligently exercising his or her management powers as a Venturer," and petitioners note the lack of evidence that this representation did not hold true for anyone who actually purchased a joint venture interest. Petitioners argue that investor expertise must be judged against those who purchase, and are not merely offered, an investment. The cases string cited for this proposition include *Youmans v. Simon* (5th Cir. 1986) 791 F.2d 341, 346–347, and *People v. Schock* (1984) 152 Cal.App.3d 379, 386 [199 Cal.Rptr. 327], which simply speak in terms of "investors" rather than "offerees," without addressing whether an offeree's expertise can properly be considered. It thus appears that petitioners in fact have no authority for their argument, and the argument cannot be correct in any event. As the North American Securities Administrators Association, Inc. (NASAA), persuasively points out in its amicus curiae brief, the securities laws regulate both the offer and the sale of securities, and a "focus only on transactions that were actually *sold* . . . would read out of the law all offenses which involve the 'offer' of a security."[5] Section 25110's qualification requirement applies by its terms to both the offer and sale of securities. Therefore, contrary to petitioners' contention, offerees' expertise can be taken into account in determining whether a security is being offered.

Turning to the third *Williamson* factor—whether the venturers are essentially dependent on some unique managerial ability of Consolidated—we again observe that this is a question of fact (see *Koch, supra*, 928 F.2d at p. 1480), and again conclude that substantial evidence supported a finding that such dependence existed here. To be sure, the investment was structured to avoid the appearance of such dependence. The first page of the private placement memorandum declares in italics that participants "are prohibited from relying on the Managing Venturer for the success or profitability of the Venture," and the questionnaire had investors initial a paragraph stating: "The undersigned warrants and represents that the undersigned is not relying on the unique entrepreneurial or managerial ability of Consolidated for the success of the captioned venture, and that his or her experience and knowledge in business affairs enable the undersigned to replace Consolidated as Managing Venturer and otherwise exercise meaningful joint venture powers. The undersigned understands and stipulates for all purposes that other drillers, Operators, Managing Venturers, and related oil and gas experts are readily available in Kansas, and elsewhere which are competent to perform Consolidated's functions." This language, while precisely tailored to the *Williamson* analysis, is not dispositive in petitioners' favor on the reliance

---

[5] Petitioners submit that NASAA's argument should be disregarded because the NASAA has no stake in the security issue in this case, but the members of this association, who include the securities regulators in all 50 states, have an interest in seeing that their authority to regulate offerings of securities is not eviscerated.

issue. (See *Tcherepnin, supra*, 389 U.S. at p. 336 [substance controls over form]; e.g., *Long, supra*, 881 F.2d at p. 133 [agreements' representations "emphasizing the investor's active role in the [business] were merely 'window dressing' . . . in reality they were wholly dependent upon the expertise of [the manager]"].)

As disclosed in the private placement memoranda, the ventures were purchasing specified lists of equipment from Consolidated affiliates at a price determined by Consolidated, and then leased by Consolidated, possibly again to Consolidated affiliates. Johnston represented that the equipment would be used at wells to which Consolidated had rights, where Consolidated knew, from prior drilling, that natural gas existed. Petitioners argue that Johnston's statements to Wroten were inadmissible hearsay, but the statements were admissible as authorized admissions because Johnston was Guardian's authorized agent, and Guardian was petitioners' authorized agent, in the transaction. (Evid. Code, § 1222; see also Gov. Code, § 11513 [providing for use of hearsay evidence in administrative adjudications].)

The record thus shows that, when the investments were made, Consolidated had already selected the equipment to purchase and set the purchase price—facts that alone might have supported a finding of dependence: "Significant pre-purchase managerial activities undertaken to insure the success of the investment may . . . satisfy *Howey*. . . . Courts have found investment contracts where significant efforts included the pre-purchase exercise of expertise by promoters in selecting or negotiating the price of an asset in which investors would acquire an interest." (*S.E.C. v. Mutual Benefits Corp.* (11th Cir. 2005) 408 F.3d 737, 743–744; see again *Holden, supra*, 978 F.2d at p. 1119, fn. 6 [focus under *Williamson* is on investors' expectation at time of original investment].) Here, in addition to equipment selection and price specification, Consolidated's pre-purchase activities included drilling that revealed where natural gas was located, and the acquisition of the rights to those locations. As a consequence, while Consolidated is correct in disclaiming any unique expertise in the field of oil and gas in general, nevertheless, it was reasonable to find that the success of the particular projects marketed here was uniquely dependent on Consolidated efforts, and that investors would be relying on those efforts in making their investments.

■ Substantial evidence established that the joint venture interests were securities under two of the three *Williamson* factors. These controlling *Williamson* factors satisfy the federal test for a security.[6]

---

[6] At oral argument on appeal, petitioners maintained that the desist and refrain order must at least be lifted as to Hugoton because the Department conceded at the hearing before the ALJ that there was no evidence of illegal activity involving that entity. The concession was inaccurate because Keegan testified to solicitation on behalf of Hugoton, as well as Anadarko.

## III.  DISPOSITION

The judgment is affirmed.

Stein, J., and Margulies, J., concurred.

---

After making the mistaken concession, the Department offered to dismiss the proceeding as to Hugoton without prejudice, but petitioners' counsel would only accept a dismissal with prejudice. The matter was thus submitted for decision as to Hugoton notwithstanding the mistaken concession, and Keegan's testimony provided substantial evidence for the ALJ's determination with respect to that entity.